# EXHIBIT 1

**KASOWITZ BENSON TORRES LLP**

Constantine Z. Pamphilis (*pro hac vice* application to be submitted)
DPamphilis@kasowitz.com
J. Michael Wilson (*pro hac vice* application to be submitted)
MWilson@kasowitz.com
Nathan W. Richardson (*pro hac vice* application to be submitted)
NRichardson@kasowitz.com
1415 Louisiana Street, Suite 2100
Houston, TX 77002
(713) 220-8800
(713) 222-0843 (fax)

Daniel A. Saunders
California Bar No. 161051
DSaunders@kasowitz.com
2029 Century Park East, Suite 2000
Los Angeles, California 90067
(424) 288-7900
(424) 288-7901 (fax)

*Attorneys for Plaintiffs Konnech Inc. and Eugene Yu*

Electronically FILED by
Superior Court of California,
County of Los Angeles
9/13/2023 5:04 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Lozano, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – CENTRAL DISTRICT

KONNECH INC., and
EUGENE YU,

                         Plaintiffs,

        v.

GEORGE GASCÓN,
LOS ANGELES COUNTY,
ERIC NEFF,
ANDREW STEVENS, and
DOES 1-10,

                         Defendants.

Case No. 23STCV22109

**COMPLAINT FOR:**

**1.  Violation of the Tom
Bane Civil Rights Act, Cal.
Civ. Code § 52.1 et seq.;
2.  Violation of Ralph Civil
Rights Act, Cal. Civ. Code §
51.7;
3.  42 U.S.C. § 1983 –
Violation of Fourth and
Fourteenth Amendments;
4.  42 U.S.C. § 1983 – *Monell*
Liability: Policy, Practice or
Custom;
5.  42 U.S.C. § 1983 – *Monell*
Liability: Ratification;
6.  Conversion;
7.  Negligence; and
8.  Intentional Infliction of
Emotional Distress.**

**DEMAND FOR JURY
TRIAL**

-- 1 --
COMPLAINT

Plaintiffs Eugene Yu ("Mr. Yu") and Konnech Inc. ("Konnech," and together with Mr. Yu, "Plaintiffs"), for their complaint against Defendants LA County District Attorney George Gascón ("Gascón"), Los Angeles County ("LA County"), LA County Deputy District Attorney Eric Neff ("Neff"), and LA County District Attorney's Office Senior Investigator Andrew Stevens ("Stevens," and collectively with LA County, Gascón, and Neff, "Defendants"), allege as follows:

## INTRODUCTION

1.      This lawsuit arises from one of the most shocking, outrageous and disgraceful violations in modern American history of a US citizen's most basic constitutional rights by powerful government officials in charge of law enforcement in one of our country's leading cities.

2.      Defendants, using threats, intimidation and coercion, and with no cause, let alone probable cause, subjected Plaintiffs, an elections logistics firm and its founder, to a politically motivated arrest, an unlawful detention and search and seizure of property, and malicious prosecution—all based solely on frivolous conspiracy theories espoused by discredited, far-right extremist grifters, True the Vote, Inc. ("TTV"), Catherine Engelbrecht ("Engelbrecht"), and Gregg Phillips ("Phillips," and together with TTV and Engelbrecht, the "Election Deniers"), who line their pockets by fundraising off of thoroughly debunked claims of election fraud, including unsupported claims that 3 million non-US citizens voted in the 2016 Presidential election and that the 2020 Presidential election was stolen from former President Donald Trump.  Despite knowing exactly with whom they were dealing, Defendants, in targeting Plaintiffs, maliciously and recklessly relied on and knowingly aligned themselves with the Election Deniers and their further discredited and utterly false conspiracy theories concerning supposed election malfeasance by Plaintiffs.  In the process, under color of law through an abuse of Defendants' official powers, Defendants have severely damaged and destroyed Plaintiffs' reputation, business and personal safety.

3.      Konnech is a small, Michigan-based company built from the ground up by its President and CEO, Plaintiff Eugene Yu.  Mr. Yu is a U.S. citizen of Chinese descent who attended college at Wake Forest University and renounced his Chinese citizenship when he became a U.S. citizen over 27 years ago.  Konnech provides governmental entities, including LA County, with an election logistics software product called PollChief that, before Mr. Yu's arrest by Defendants, was

used by three dozen cities and counties to recruit, train and schedule poll workers and to coordinate the distribution of equipment and supplies. Konnech has never provided any voter registration, ballot generation, tabulation or other such voting-related services, and thus Konnech's services could not affect election results.

4.      Defendants violated Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and the Tom Bane Civil Rights Act, CAL. CIV. CODE § 52.1, by using threats, intimidation and coercion and improperly and unlawfully subjecting Plaintiffs to an improper arrest, search, seizure and malicious prosecution weeks before the 2022 midterm election (the "2022 Midterm Election").

5.      The motive of Defendants Stevens and Neff—who it turns out were closely aligned with the Election Deniers—was to weaponize the Election Deniers' frivolous and thoroughly debunked election fraud claims to gin up a political controversy and publicity to enable the Election Deniers to raise even more money on the eve of the 2022 Midterm Election under the guise of "political fundraising."

6.      As for Defendant Gascón, a self-proclaimed progressive prosecutor endorsed by individuals affiliated with the Communist Party USA, who has come under severe criticism for his soft-on-crime policies, he saw an opportunity to use Mr. Yu's arrest, in a public atmosphere of strong anti-China sentiment, for his own political gain to try to burnish his anti-crime credentials. In fact, immediately after Mr. Yu's arrest, Gascón issued a press release and held a press conference to brag about it. And this is apparently not the first time Gascón has abused his power for personal gain; he has come under public scrutiny, and has been sued by over a dozen of his own LA County prosecutors (including one who recently won a $1.5 million verdict against Defendant LA County), for allegedly abusing his powers and retaliating against them for questioning his sweeping prosecutorial policy changes, such as eliminating cash bail, refusing to prosecute juveniles as adults, refusing to prosecute misdemeanor crimes, and rejecting sentencing enhancements. Gascón also narrowly avoided a recall election and has faced a torrent of no-confidence votes by as many as 30 city councils due to his soft-on-crime policies. Accordingly, Gascón, like Stevens and Neff, but for his own purposes, also sought to weaponize the conspiracy theories advanced by former

-- 3 --

President Donald Trump and the Election Deniers by abusing his prosecutorial powers against someone whom the Election Deniers had accused of being an operative of the Chinese Communist Party.

7. As a proximate result of Defendants' actions, Plaintiffs have suffered damages in excess of $80 million. Following Mr. Yu's wrongful arrest, seizure of property, and Gascón's press conference and press release, Konnech lost most of its customers, over 60% of its income, and has since struggled to survive without any new customers. As a result of Defendants' actions, Mr. Yu and his family have also suffered extreme emotional distress and have had to vacate their home and office due to death threats and vandalism.

8. Defendants' involvement with the Election Deniers began at least as early as August 13, 2022, two months before they arrested Mr. Yu, at "The Pit," an invitation-only event in Arizona organized and promoted by the Election Deniers, who themselves were catapulted onto the national scene following their claims in 2017 that over 3 million non-US citizens voted in the 2016 Presidential election. After failing to provide any support for those claims, the Election Deniers again sought to attract national media attention through the release of their thoroughly debunked movie "2000 Mules," which claimed that the 2020 Presidential election was plagued by fraudulent ballots. The Election Deniers advertised The Pit as an event where they would finally release "devastating information" that would definitively prove that the 2020 Presidential Election was stolen.

9. Because no such "devastating" proof exists, the Election Deniers instead used The Pit as a platform to publicly launch their newest baseless conspiracy theory—an attack against Konnech and its CEO, Mr. Yu. At The Pit, the Election Deniers openly claimed that they had hacked into and stolen data from a Konnech server in China—allegedly including the personal identifying and financial information of 1.8 million U.S. poll workers ("U.S. Poll Worker Data")— and that Konnech was a vehicle for international espionage on behalf of the Chinese Communist Party ("CCP") to interfere with U.S. elections.

10. Present at The Pit was a host of election fraud conspiracy theorists, including Kari Lake and Christina Bobb, and other QAnon adherents. Defendant Stevens himself also attended

The Pit after being personally invited by the Election Deniers. In fact, according to the Election Deniers, there was "a lot of law enforcement in the crowd that day," and the information disclosed at The Pit was targeted "directly to them[.]" However, Defendants apparently were the only law enforcement officials willing to weaponize the Election Deniers' conspiracy theories against Plaintiffs.

11. The Election Deniers hoped to convince Defendant Stevens to use his official powers to further bolster and spread the Election Deniers' disinformation and baseless conspiracy theory that Plaintiffs were Chinese spies, and to further enhance the Election Deniers' supposed "fundraising" efforts off of their purported political, racist and xenophobic beliefs. As the Election Deniers revealed to Defendant Stevens and others at The Pit, they had previously peddled their election fraud conspiracy claims about Konnech to the FBI in an effort to have Plaintiffs prosecuted for what they claimed was CCP interference in U.S. elections. According to statements made by the Election Deniers at The Pit, the FBI spent 15 months investigating Election Deniers' accusations concerning Plaintiffs. The FBI, however, apparently found no evidence of wrongdoing and refused to prosecute Plaintiffs. Instead, the FBI opened an investigation into the Election Deniers for hacking into Konnech's computers and stealing U.S. Poll Worker Data. Indeed, the notion that a vast international conspiracy concerning election fraud would be ignored or even concealed by the FBI, yet proven by armchair conspiracy theorists and con artists using nothing more than basic internet searches and posts on social media, itself demonstrates that Defendants were motivated by politics, headlines, and personal gain rather than probable cause. Again, Defendants knew all of this before they arrested Mr. Yu and raided his home and offices, and before they charged him with a crime, as law enforcement official Defendant Stevens was present at The Pit when the Election Deniers candidly admitted to having committed the crimes of computer hacking and stealing data.

12. Less than a month after The Pit, Konnech sued the Election Deniers on September 12, 2022, in a Houston, Texas federal court for, among other things, defamation, hacking, and theft (the "Houston Lawsuit"). U.S. District Judge Kenneth Hoyt immediately granted Konnech a temporary restraining order which found that, based on the same statements the Election Deniers

made to Defendant Stevens at The Pit, Konnech had a substantial likelihood of success on the merits on its claim that the Election Deniers had illegally hacked into Konnech's servers. The TRO prohibited the Election Deniers and anyone acting in concert with them from hacking into Konnech's computers and stealing its data and ordered the Election Deniers to identify all persons involved in accessing and stealing Konnech's data, including U.S. Poll Worker Data, and to return any data they had taken from Konnech. The Election Deniers, however, later denied ever possessing such data, thus proving the falsity of the basis for all of their statements about Konnech at The Pit. As would later become apparent, the Defendants were aware of the Houston Lawsuit and the TRO before they decided to proceed with Mr. Yu's arrest and the search and seizure of Plaintiffs' computers and other equipment.

13.     In the days following the filing of the Houston Lawsuit, and before Defendants executed their unlawful arrest, search and seizure, news outlets covering the Houston Lawsuit published several articles online highlighting that the Election Deniers' numerous claims of election fraud "have failed to stand up to basic scrutiny,"[1] and that they have "peddled unsubstantiated claims of voter fraud," and have "been accused of misusing donations."[2] These articles—which at a minimum put Defendants on notice of the Election Deniers' obvious lack of credibility—were available to Defendants had they conducted even a cursory Google search about the Election Deniers whose unsubstantiated allegations spurred Defendants' entire investigation.

14.     Defendants thus knew or should have known that a federal judge had found it likely that the Election Deniers had engaged in conduct amounting to crimes, that the FBI had investigated and found no evidence to support those accusations, and that the Election Deniers had a history of fabricating election malfeasance. Defendants nevertheless chose to take the word of the discredited Election Deniers over that of a United States District Judge and the FBI.

---

[1] *See* Natalia Contreras, *Lawsuit alleges Texas' True the Vote hacked data and targeted small election vendor with racist, defamatory campaign*, The Texas Tribune (Sept. 14, 2022), available at https://www.texastribune.org/2022/09/14/texas-true-the-vote-lawsuit-konnech/.

[2] *See* Benjamin Wermund By, Taylor Goldstein, *Texas lawsuit seeks to rein in True the Vote over alleged hacking, defamatory remarks,* Houston Chronicle (Sept. 15, 2022), available at https://www.houstonchronicle.com/politics/texas/article/Texas-lawsuit-seeks-to-reign-in-True-the-Vote-17445102.php.

15.     In the Houston Lawsuit, after several delays by the Election Deniers—which, in hindsight were purposely aimed at ensuring that Defendants had sufficient time to execute their unlawful search, seizure, arrest and detention of Mr. Yu and of Konnech's business offices based on their claiming they were only available for the hearing on a date that they knew would follow Mr. Yu's arrest—a hearing on Konnech's motion for a preliminary injunction was set for October 6, 2022, during which Mr. Yu was to testify on behalf of Konnech and against the Election Deniers. The Election Deniers knew that if the hearing proceeded as scheduled, they would be forced to answer for their non-compliance with the TRO, including their failure to identify all persons involved in allegedly hacking into Konnech's computers.

16.     However, on October 4, 2022, after Mr. Yu left his Michigan home to drive to the airport for his flight to Houston to meet with his attorneys and prepare for the preliminary injunction hearing, Mr. Yu was arrested, and his home and car, located in the Meridian Charter Township, along with Konnech's two Michigan business offices, located in the Meridian Charter Township and East Lansing, were raided in a joint operation between local Michigan and LA County law enforcement, with law enforcement personnel in Michigan acting as an arm of Defendant LA County at the direction of the LA County DA's Office's Bureau of Investigation, specifically including Defendant Stevens. Shockingly, the arrest, search and seizure were all conducted without probable cause and, although touted by Defendant Gascón at a press conference as involving theft of personal identifying information, was based purely on an alleged technical breach of a contract between Konnech and LA County, and purportedly based on Konnech's failure to store U.S. Poll Worker Data on a local server. Mr. Yu, however, was not a party to that contract, he received no payments under the contract, and LA County had received all the services for which it had contracted. Defendants further seized data and information related to time periods that pre-dated the contract at issue, and for which probable cause could not exist because they could not remotely relate to any criminal charges asserted in connection with that contract. Notably, the LA County Registrar—who worked very closely with Konnech as its biggest customer—told the media that the LA County DA's Office did not involve the LA County Registrar in its investigation of Plaintiffs and that they did not learn of the LA County DA's actions until Mr. Yu had already been

1   arrested.  In other words, even though the LA County Registrar had worked closely with Konnech
2   for over two years on LA County elections and had conducted two security audits in the two years
3   since contracting with Konnech—all of which provided it with superior knowledge of Konnech's
4   product and services—the LA County DA's Office purposely excluded the LA County Registrar
5   from the investigation and instead relied solely upon unsupported allegations made by infamous
6   and thoroughly debunked conspiracy theorists.

7       17.    Although a spokesperson for the LA County DA's Office told reporters that the
8   Election Deniers had not provided any information to Defendants about the purported case against
9   Mr. Yu, counsel for the Election Deniers, at the October 6, 2022, preliminary injunction hearing
10  "begged" Judge Hoyt to call the LA County DA's Office to discuss the arrest of Mr. Yu in an effort
11  to prevent the judge from requiring their compliance with the TRO and ruling on the preliminary
12  injunction.  Judge Hoyt, however, rejected that request, expressing the view that Defendants "may
13  be obstructing justice by what they have done" and noted that "we are not having a hearing [*i.e.*,
14  the preliminary injunction hearing] because [Mr. Yu] has been arrested by people who are intent
15  on flipping the script."

16      18.    Apparently undeterred, during a subsequent show cause and contempt hearing in the
17  Houston Lawsuit on October 27, 2022, counsel for the Election Deniers informed the court that
18  Deputy District Attorney for LA County Marc Beaart "asked for the opportunity to address the
19  Court [Judge Hoyt] by telephone directly off the record," in defense of the Election Deniers.  Judge
20  Hoyt, a federal judge for more than 30 years, noted that it "is quite unusual for a district attorney
21  to want to talk to me about anything" and that he would not permit Mr. Beaart "to interfere in the
22  proceedings in this case."

23      19.    Without a doubt, Defendants and the Election Deniers were adamant that the
24  Election Deniers avoid testifying about their violation of the TRO and patently false conspiracy
25  theories, so much so that Defendants deprived Mr. Yu of his liberty to travel to Houston, and
26  succeeded in holding him in custody without bail for an alleged breach of a contract to which Mr.
27  Yu was not even a party.  To be clear, because it was Konnech's burden to demonstrate contempt
28  and the right to a preliminary injunction, by arresting Mr. Yu and preventing him from testifying,

the Election Deniers knew that they would not have to take the stand to testify.  While Mr. Yu was eventually released from jail, he was nevertheless confined to a hotel in Los Angeles under house arrest—2,200 miles from his home and Konnech's business offices—which he could only leave to visit his defense attorney, and was further required to wear two different ankle monitors (one for Michigan and one for California).  Mr. Yu was also prohibited from speaking with any Konnech employees or conducting any business for Konnech, which was particularly damaging given that the 2022 Midterm Election was quickly approaching and news of his arrest had sent the company into turmoil.

20.    Despite Defendants' attempts to avoid it, at the October 6, 2022 hearing, Judge Hoyt ordered Election Deniers Phillips and Engelbrecht to appear on October 27, 2022, to testify in the Houston Lawsuit in connection with their contempt of the TRO.  Their testimony demonstrated to the Defendants that they should not and could not have continued to rely on the Election Deniers as the basis for their actions against Plaintiffs.  Both Election Deniers testified, under oath, that they did not have and never had possession of any Konnech data or U.S. Poll Worker Data and provided directly conflicting accounts of whether the U.S. Poll Worker Data that they claimed were stored on a Konnech server in China were actually stored on a Konnech server.  This testimony demonstrates that the Defendants could not have received, and based on their testimony never actually had, any of the U.S. Poll Worker Data at the heart of their criminal action from the Election Deniers, and instead chose to take their word for it despite their obvious lack of credibility.  Shockingly, the Election Deniers refused to identify all persons involved in allegedly accessing the U.S. Poll Worker Data at the center of the Houston Lawsuit and the Defendants' criminal action, even after a United States District Judge ordered them to do so.  As a result, four days later, the Election Deniers were jailed for contempt.

21.    Knowing he had done nothing wrong, Mr. Yu was left questioning how such a thing could happen to him and why the business he created was being destroyed by Defendants, even though the LA County Registrar was, and remains to this day, Konnech's largest customer.[3]  After

---

[3] On July 14, 2023, Konnech and LA County entered into an amended contract for Konnech to continue to provide LA County with election logistic services.

COMPLAINT

the eventual dismissal of the charges against Mr. Yu, and in light of statements made by the LA County DA's spokesperson, it became clear that Defendants had aligned themselves with the Election Deniers in a scheme to destroy Plaintiffs for their own personal gain and in support of their own political, racial and xenophobic beliefs.

22.     Defendants' alignment with the Election Deniers is undeniable.  As alleged above, Defendant Stevens personally attended The Pit at the invitation of the Election Deniers.  Moreover, the Election Deniers testified in the Houston Lawsuit that Defendant Neff spoke to the Election Deniers as part of his supposed investigation into Plaintiffs, and that the Election Deniers testified before the grand jury which led to the indictment against Mr. Yu.

23.     Perhaps even more shocking, Defendant LA County hired, as purported forensic investigators to accompany and assist law enforcement on the unlawful raids at Mr. Yu's home and Konnech's offices, the Election Deniers' close allies, including Harry Haury and Nate Cain, the CEO and founder of a so-called cyber security business Cain & Associates, respectively. Defendants did so with knowledge that Haury had appeared on stage at The Pit as a speaker where he espoused his views on CCP interference in U.S. elections, demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," and asked people to send money to the Election Deniers under the guise of political fundraising in advance of the 2022 Midterm Election. On September 11, 2023, Haury stated on a podcast that he testified before the grand jury that indicted Mr. Yu—which he confirmed was done in "in a hurry"—, meaning that LA County hired a purported fact witness to accompany and assist on the raids at Mr. Yu's home and Konnech's offices, and to serve as a purported expert *after* he had already testified as fact witness, and upon Haury's own recommendation even though Defendants had at their disposal the fourth largest law enforcement agency in the county with over 300 employees, including their own forensic computer experts.  Haury's latest admission thus demonstrates that the fix was in, that the entire prosecution of Mr. Yu was about a "political realization," and that Defendants would do anything, and hire anybody, that they knew would achieve the result they wanted.

24.     Cain had also publicly asked people to send money to the Election Deniers in furtherance of political, racial and xenophobic beliefs, and years earlier he had his own home raided

1  by the FBI for allegedly stealing federal property in an attempt to implicate Hillary Clinton and the

2  Clinton Foundation in a scandal concerning the U.S. Government's approval of the sale of Uranium

3  One to Rosatom, a Russian nuclear energy agency, while he was an FBI contractor.  Defendants

4  also were or should have been aware of additional red flags demonstrating the bias and lack of

5  credibility of Cain based on a previously submitted "expert report"—publicly available to

6  Defendants before they hired him as a consultant to engage in the unlawful raid and seizure of

7  Plaintiffs' property—in connection with an Arizona lawsuit, in which he brazenly claimed that the

8  results of the 2020 Presidential election should not be certified.  Those "forensic investigators"

9  claim to have spent in excess of 600 hours performing work as consultants to Defendants, including

10  in executing a search warrant against Plaintiffs.

11        25.    And at least equally appalling, Haury admitted in a February 2023 affidavit filed

12  in the Houston Lawsuit that, although all of Konnech's equipment had already been seized and was

13  in the process of being imaged, he hacked into Konnech's internet-connected e-mail accounts and

14  conducted an illegal wiretap by monitoring those accounts and communications, including

15  potentially attorney-client privileged communications, for four days *after* the unlawful LA County

16  search warrants were executed.   Haury apparently did so for the purpose of pursuing his shared

17  goals with the Election Deniers and with the power and authority granted to him by Defendants.

18  Defendants even failed to require Haury or Cain to sign a confidentiality or non-disclosure

19  agreement in connection with their work on the investigation.  This was particularly important

20  because Haury and Cain later admitted that they kept materials seized from Plaintiffs that they

21  received through their work with Defendants, and they have publicly threatened to release those

22  materials.  Defendants have done nothing to stop the release of such materials or otherwise to seek

23  their return despite Plaintiffs' repeated requests that Defendants do so.

24        26.    Although Defendants initially claimed to reporters that the Election Deniers were

25  not involved with the investigation or arrest of Mr. Yu, Defendants were later forced to correct their

26  lie and admit that the Election Deniers were in fact involved after the Election Deniers published

27  their own statement taking credit for the arrest of Mr. Yu, and after the attempt by Deputy District

28  Attorney Beaart to interfere in the October 6 preliminary injunction hearing.  Election Denier

1    Phillips also confirmed in a legal filing in the Houston Lawsuit that he was called to testify before

2    the LA County grand jury that indicted Mr. Yu.

3          27.    In an effort to further conceal from Plaintiffs and the general public the politically

4    biased underpinnings of the arrest and prosecution of Mr. Yu, Defendants sought to cover their

5    tracks—as Defendant Gascón himself directly ordered—by abandoning the original sealed criminal

6    indictment of Mr. Yu that was the basis for the unlawful search warrant executed on Plaintiffs.

7    Instead, Defendants chose to proceed on a felony complaint against Mr. Yu that was devoid of any

8    mention of the Election Deniers.  But instead of providing Mr. Yu and his defense counsel with a

9    copy of the complaint, and in order to ensure maximum damage, Defendants first leaked a copy of

10   the criminal complaint to national media, including the *New York Times*.  Notably, however, this

11   new criminal complaint was signed by Defendant Stevens, who attended The Pit event at the

12   Election Deniers' invitation, and Defendant Neff, who admittedly worked with the Election Deniers

13   as part of his investigation—both of whom aligned themselves with the Election Deniers.  Despite

14   Defendants' prior public claims that the case concerned the theft of personal identifying

15   information and one of the largest data breaches in the history of the United States, when the

16   criminal complaint was finally released, it alleged only that Mr. Yu embezzled funds from LA

17   County in connection with Konnech's contract to provide election logistics software for LA

18   County's elections.  However, the charges asserted against Mr. Yu in his personal capacity

19   ultimately constituted nothing more than a purported breach of contract by Konnech, a contract to

20   which Mr. Yu was not himself a party and pursuant to which he was not paid any money in his

21   individual capacity, which unquestionably does not constitute a crime.

22         28.    Because the criminal complaint was meritless, legally untenable and lacked any

23   indicia of probable cause, Mr. Yu immediately filed a motion to dismiss the baseless charges

24   brought against him.  And on November 9, 2022—precisely one day after the 2022 Midterm

25   Election, and thus one day after the Election Deniers no longer had seemingly plausible grounds

26   for their supposed "political fundraising" engineered through baseless election fraud conspiracy

27   theories about Plaintiffs—Defendants dismissed the case and dropped all charges against Mr. Yu

28   without even attempting to defend the complaint.

-- 12 --

COMPLAINT

29.   Even more incredibly, in the days after the charges were dropped, the LA County DA's Office stunningly admitted that the arrest and prosecution had been improper. First, an LA County DA's Office spokesperson confirmed that "[d]uring the course of this prosecution, upper-level management became aware of irregularities in how the case was presented."  That admission included an obvious but unavailing attempt to exonerate Gascón who, given his press statement and press conference announcing the arrest, had to have been aware of what occurred.  The spokesperson further stated that "we are concerned about both the pace of the investigation and the potential bias in the presentation and investigation of the evidence."  In other words, the investigation had obviously been rushed for the sole purpose of arresting and charging Mr. Yu before he was due to testify against the Election Deniers and before the 2022 Midterm Elections. It was also done in an apparent effort to gin up publicity and a political controversy personally supported by Defendants Neff and Stevens and consultants Cain & Associates, Cain and Haury, and to accelerate the Election Deniers' "fundraising" efforts in the weeks leading up to the 2022 Midterm Election.  The charges against Mr. Yu also provided Defendant Gascón with a scapegoat to appease his DA subordinates that had rejected him and to help dispel accusations that he was too soft on crime.  But once that election had passed, and once Defendants had made the headlines they set out to make, Defendants immediately dismissed the transparently baseless criminal charges against Mr. Yu.

30.   Shortly after the LA County DA's Office's striking admission of investigation bias, it was reported that Defendant Neff had been placed on administrative leave because of his conduct in connection with the malicious investigation and prosecution of Mr. Yu.  Indeed, according to statements made by consultant Cain on a September 7, 2023, podcast, Defendant Neff "was the one that pressed forward with things," apparently referring to the prosecution of Mr. Yu and the search and seizure of Plaintiffs' property.

31.   Defendants' misconduct is also demonstrated by their treatment of Konnech's equipment.  Despite the fact that Konnech had not been charged with any crime, and despite the lack of any probable cause and on the apparent basis of a sealed criminal indictment premised on the testimony of the Election Deniers (which Defendants abandoned within a week), Defendants

seized all of Konnech's computers and the equipment—valued at approximately $1 million—that Konnech desperately needed to support its election logistics software to fulfill its customer contracts and to ensure that the many cities and counties that rely on Konnech for its election logistics, including LA County, could properly manage the 2022 Midterm Election (which was only a month away at the time of Mr. Yu's arrest).  Eventually, on November 16, 2022, a California court ordered the return of all of Konnech's equipment.  However, to this date, which is more than eleven months since Mr. Yu's arrest and more than nine months since a California court ordered Defendants to do so, Defendants have still refused to return to Konnech its equipment.

32.     In the fallout from the baseless arrest and malicious prosecution of Mr. Yu, Konnech lost over 60% of its income which caused damages in excess of $80 million.  But despite the dismissal of the charges, Defendants' misconduct is still damaging Konnech.  Konnech is still losing customers, Konnech has been unable to obtain any new customers, Mr. Yu and his family are still suffering extreme emotional distress, and Mr. Yu, his family, and Konnech's employees have been the subject of repeated death threats and vandalism.

33.     Ironically, despite the best efforts of the LA County District Attorneys' Office ("LA County DA's Office") and Defendants to crush Plaintiffs through baseless and politically motivated charges, and the enormous damage they have caused, LA County itself has remained a steadfast customer of Konnech's PollChief software and related services—which only confirms the outrageousness of Defendants' misconduct and the necessity to hold them accountable.

34.     Plaintiffs therefore file this action to recover the damages they have suffered as a result of Defendants' violations of Plaintiffs' constitutional rights and their continued wrongful seizure of Plaintiffs' computers and equipment, and to require the immediate return of Plaintiffs' computers and equipment.

## PARTIES

35.     Plaintiff Konnech Inc. is incorporated in Michigan and headquartered in East Lansing, Michigan.

36.     Plaintiff Eugene Yu is an individual residing in Michigan.

COMPLAINT

37.     Defendant Los Angeles County is a public entity established and maintained by the laws and Constitution of the State of California, and owns, operates, manages, and controls the LA County DA's Office, and employs and/or is responsible for the other Defendants, as well as Cain & Associates and consultants Cain and Haury, in this action.  Defendant Los Angeles County is vicariously liable for the acts and omissions of the other Defendants, as well as Cain & Associates and consultants Cain and Haury, and any investigators described herein pursuant to common law and California Government Code § 815.2.

38.     Defendant George Gascón is an individual residing in Los Angeles County, California.

39.     Defendant Eric Neff is an individual residing in Los Angeles County, California.

40.     Defendant Andrew Stevens is an individual residing in Napa County, California.

41.     The names and capacities, whether individual, corporate, associate or otherwise, of Doe Defendants 1 through 10 ("Doe Defendants"), inclusive, and each of their roles in this case, are unknown to Plaintiffs who therefore sue said Doe Defendants by fictitious names.  Plaintiffs further allege that each of said fictitious Doe Defendants is in some manner responsible for the acts and occurrences set forth herein.  Doe Defendants will be identified through discovery, and Plaintiffs will amend this complaint to show their true names and capacities, and the manner in which each fictitious Doe Defendant is responsible, when ascertained.

42.     Defendants are and at all material times have been the agents and servants of, and acted in concert with, one another with respect to the acts and conduct herein alleged, and are responsible for and liable to Plaintiffs for the damages arising out of such conduct.

**JURISDICTION AND VENUE**

43.     Jurisdiction is proper in this Court because it has general subject matter jurisdiction and the amount in controversy exceeds $25,000, exclusive of attorneys' fees, interest and costs, and specific subject matter pursuant to California Government Code § 946.6.

44.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 because (i) some of the Defendants are residents of Los Angeles County; and (ii) events giving rise to Plaintiffs' claims occurred in Los Angeles County.

45.     This Court has personal jurisdiction over Defendants pursuant to California Code of Civil Procedure § 410.10 because they are citizens of California and because they committed tortious and other unlawful misconduct against Plaintiffs while in California.

## **FACTUAL BACKGROUND**

**Konnech**

46.     Konnech is a U.S. company which is incorporated in Michigan and was founded by its President and CEO, Eugene Yu, who is a U.S. citizen of Chinese descent.  Mr. Yu built Konnech on his own from the ground up.  Konnech provides governmental entities—including Los Angeles County—with an election logistics software product called PollChief which those governmental entities use to recruit, train and schedule poll workers; coordinate the distribution of equipment and supplies to polling places; and dispatch support personnel to address technical and other issues. Konnech does not select, communicate, or otherwise interface with any poll workers.  And Konnech's software products are not involved in any way in the registration of voters, the production, distribution, scanning, or processing of ballots, nor the collection, counting or reporting of votes.  Konnech never handles any ballots and no ballots or other voting counts ever enter any of Konnech's computer servers.

47.     Los Angeles County has been a Konnech customer since 2020.  Konnech has provided its PollChief software to LA County for use in both local and federal elections.  LA County is in fact Konnech's largest customer.  Pursuant to Konnech's contract with LA County, LA County, along with a large third-party consulting firm, conducted two security audits of Konnech in the first two years of their contract.  In fact, LA County was in the middle of its second security audit of Konnech at the time of Mr. Yu's arrest.  LA County has continued to use Konnech's election logistics services since conducting those security audits and despite the arrest of Mr. Yu and seizure of Plaintiffs' equipment.

**Defendant Gascón and LA County**

48.     LA County District Attorney George Gascón is a "progressive" prosecutor who was elected to office in 2020. Defendant Gascón ran on a platform of a "more humane" criminal justice system, pursued an agenda premised on reducing incarceration by eliminating cash bail, refused to

-- 16 --

ever charge juveniles as adults, rejected application of enhancements to sentencing lengths, and established a policy of not prosecuting certain misdemeanors associated with homelessness and trespassing.  Shortly after he took office as the lead prosecutor in the state's largest county, however, the county became plagued by scandal due to his lack of criminal enforcement.

49.     As a result, Defendant Gascón was subjected to an initial recall effort in March 2021, which eventually failed.  Then, another recall effort began, needing 566,857 signatures to place his job on the ballot.  Although the recall efforts obtained 715,833 signatures, nearly 200,000 signatures were determined to be invalid, meaning Defendant Gascón narrowly avoided a recall election in August 2022.

50.     But perhaps most embarrassing for Defendant Gascón, 30 city councils in LA County issued a vote of no confidence in Defendant Gascón, and virtually all (98%) of the LA County prosecutors who participated in a vote—representing an astounding 83% of all prosecutors in the county—along with the Los Angeles Association of Deputy District Attorneys supported the recall, believing that Defendant Gascón's directives to his prosecutors violated state law.  And even more telling about the internal strife of the LA County DA's Office, Defendant Gascón has been sued by over a dozen of his own LA County prosecutors for abusing his power and retaliating against them by demoting the prosecutors from long-held positions after they questioned the legality of his sweeping policy changes.  In fact, one such prosecutor recently was awarded a $1.5 million verdict for her retaliation claims against Defendant Gascón.[4]

51.     In an apparent effort to change his soft-on-crime image, appease his rank-and-file prosecutors, and ward off future recall attempts less than two months after the latest recall efforts failed, Defendant Gascón made Mr. Yu his own political pawn, knowing that if he trumpeted Mr. Yu's arrest, the high-profile nature of the arrest would garner national headlines, divert attention away from the recall and improve his public image.  In doing so, Defendant Gascón recklessly ignored the lack of any probable cause and the unreliable, not credible and untrustworthy source of

---

[4] James Queally, *Gascón loses retaliation case, a grim omen for the L.A. County D.A.*, Los Angeles Times (March 6, 2023), available at, https://www.latimes.com/california/story/2023-03-06/jury-awards-l-a-prosecutor-1-5-million-in-retaliation-suit-against-d-a-george-gascon.

COMPLAINT

the allegations against Plaintiffs (*i.e.*, the Election Deniers), failed to conduct any meaningful investigation, and instead relied on the work of his subordinates, Defendants Stevens and Neff, and consultants of a so-called cyber security business Cain & Associates, Cain and Haury, all of whom were already aligned with the Election Deniers in furtherance of their political, racial and xenophobic beliefs.  Ultimately, Defendants brought baseless criminal charges against Mr. Yu—charges that effectively amounted to a technical breach of a contract to which Mr. Yu was not even a party—and then proceeded to tout the charges through Defendant Gascón's recklessly false public statements.

52.    Defendant Gascón's efforts apparently worked, as demonstrated by the praise he immediately received from former President Trump—his least likely political ally—who exclaimed that "Gascón could be a National hero" and "could change his image of being weak and ineffective overnight."



53.     Even the *Los Angeles Times* was so confused by Defendant Gascón's conduct that they released an article titled: "How did Gascón end up launching a criminal probe sparked by far-right election conspiracy theories?"[5]

54.     But the truly outrageous nature of these charges is also underscored by the fact that, even after Mr. Yu's arrest, LA County—Konnech's biggest client and the purported victim of the "crimes" with which Mr. Yu was charged—continued to use Konnech's services and its software and worked hand-in-hand with Konnech employees in the 2022 Midterm Election, as well as city elections within LA County in 2023, as the *Los Angeles Times* article also highlighted.[6]

55.     Moreover, despite the fact that the LA County Registrar contracts directly with Konnech, had worked with Konnech on a near-daily basis and conducted two security audits under that contract, the LA County Registrar's Office confirmed that it was never contacted about the LA County DA's investigation and did not learn about Defendants' investigation until *after* Mr. Yu was arrested.  Despite that, since they are all employees of LA County, the knowledge of the LA County Registrar's Office is imputed to the LA County DA's Office, and specifically to the Defendants in this action.  As such, Defendants cannot use ignorance as an excuse for their malfeasance directed at Plaintiffs.

**The Election Deniers**

56.     Defendants' malfeasance began as soon as they associated and aligned themselves with the Election Deniers who, based purely on racism and xenophobia and their own desire for money, fame and notoriety, saw Plaintiffs as easy targets for political conspiracy theories that could enrich the Election Deniers under the guise of "political fundraising" in the weeks leading up to the 2022 Midterm Election, particularly given Mr. Yu's Chinese ethnicity and public sentiment against China.

---

[5] James Queally, Sarah D. Wire, *How did Gascón end up launching a criminal probe sparked by far-right election conspiracy theories?*, Los Angeles Times (Nov. 16, 2023), available at https://www.latimes.com/politics/story/2022-11-16/gascon-targeted-poll-worker-registration-company-at-heart-of-conspiracy-theories.

[6] *Id.*

COMPLAINT

57.     The Election Deniers' racism and xenophobia is readily apparent from their social media posts, which demonstrate that they believe Mr. Yu is a communist simply because he was born in China and is of Chinese descent (*e.g.*, the below picture of Mr. Yu with communist flags behind him, posted by Election Denier Phillips' business account on Truth Social, and the derogatory and juvenile post directed at Mr. Yu concerning Chinese-made clothing):

 

58.     Likewise, and consistent with the Election Deniers' expressed views, Defendants' consultant Harry Haury of Cain & Associates demonstrated his own racism and xenophobia at The Pit, where he said to the audience (which included Defendant Stevens) that, "*any* Chinese nationalized citizen is a risk."

59.     The Election Deniers first appeared on the national scene in 2017 after Election Denier Phillips claimed that he had evidence that 3 million non-U.S. citizens voted illegally in the 2016 Presidential election.  The claim drew national attention when former President Trump tweeted to his then-more than 22 million Twitter followers on January 27, 2017, that "Gregg

Phillips and crew say at least 3,000,000 votes were illegal.  We must do better."[7]  That same day, Election Denier Phillips appeared on a nationally televised interview on CNN during which he refused to provide (and still refuses to provide) evidence that even one person, let alone 3 million people, voted illegally.[8]  Notably, some comments from viewers of those interviews in 2017 noted the lack of Election Denier Phillips' credibility, saying things such as "[i]f Trump considers this guy to be a credible source we are screwed as a country," and "[t]his guys proof wouldn't hold up in a third grade classroom, let alone any scientific census of his work."

60.     The Election Deniers re-appeared on the national scene following the 2020 U.S. Presidential election and sought to capitalize on claims of election fraud through their involvement in the production of a so-called documentary titled "2000 Mules," in which they sought to convince their followers that people, who they refer to as "mules," were paid to collect and deposit fake ballots into ballot boxes for the 2020 Presidential election which they concluded changed its outcome.  The theories peddled in *2000 Mules*, however, have been repeatedly disproven, and Defendants knew this.[9]

61.     Indeed, Defendants knew exactly who the Election Deniers were when they decided to join forces against Plaintiffs.  Aside from the fact that Defendant Stevens attended The Pit, rudimentary due diligence into the Election Deniers, such as a simple Google search, would have

---

[7] *See* Jan. 27, 2017 @realDonaldTrump Tweet, available at, https://twitter.com/realDonaldTrump/status/824968416486387713.

[8] *See* Election Denier Phillips CNN interview with Chris Cuomo (Jan. 27, 2017), available at, https://www.youtube.com/watch?v=9MSSLUhevto&t=3s; *see also* Election Denier Phillips' CNN interview with John Berman (Jan. 28, 2017), available at, https://www.youtube.com/watch?v=j4ogfo19kaM.

[9] *See Fact Check-Does '2000 Mules' provide evidence of voter fraud in the 2020 U.S. presidential election?*, Reuters (May 27, 2022), available at, https://www.reuters.com/article/factcheck-usa-mules-idUSL2N2XJ0OQ; *FACT FOCUS: Gaping Holes in the Claims of 2k Ballot 'Mules'*, Associated Press (May 3, 2022), available at, https://www.usnews.com/news/politics/articles/2022-05-03/fact-focus-gaping-holes-in-the-claim-of-2k-ballot-mules; Tom Dreisbach, *A pro-Trump film suggests its data are so accurate, it solved a murder. That's false*, NPR (May 17, 2022), available at, https://www.npr.org/2022/05/17/1098787088/a-pro-trump-film-suggests-its-data-are-so-accurate-it-solved-a-murder-thats-fals; Phillip Bump, *Even the geolocation maps in '2000 Mules' are misleading*, The Washington Post (May 19, 2022), available at, https://www.washingtonpost.com/politics/2022/05/19/even-geolocation-maps-2000-mules-are-misleading/.

COMPLAINT

revealed to Defendants that the Election Deniers are the "Bonnie and Clyde" of election fraud,[10]
and people who have enriched themselves by spreading conspiracy theories—presented as factual
in nature—about the 2016 and 2020 Presidential election, largely funded by "fundraising" money
funneled through TTV, which is known as the "big grift."[11]   A simple internet search would have
also revealed Election Denier Phillips' Truth Social page, which is replete with bizarre conspiracy
theories devoid of all reason (see below):



[10] *See* Mimi Swartz, *How True the Vote Fabricates Claims of Election Fraud, for Fun and Profit*, Texas
Monthly (Aug. 22, 2022), available at, https://www.texasmonthly.com/news-politics/true-the-vote-election-fraud/.

[11] *See* Cassandra Jaramillo, *She Helped Create the Big Lie.  Records Suggest She Turned It Into a Big Grift*,
Reveal News (June 8, 2022), available at, https://revealnews.org/article/true-the-vote-big-lie-election-fraud/.

COMPLAINT

62.    Rudimentary internet searches would have further revealed to Defendants that Election Denier Phillips had been accused by lawmakers of ethics violations and using his prior government positions in Mississippi and Texas to steer government contracts to his own affiliated companies to financially benefit himself.[12]  In fact, one Senator from Mississippi was quoted as saying that Election Denier Phillis has "always been a little loose with the truth."[13]

63.    The Election Deniers have also been the subject of many public lawsuits premised on false claims of election fraud, which should have served as additional red flags demonstrating the Election Deniers' lack of credibility and controversial underpinnings.  For example, the Election Deniers are the subjects of a pending voter intimidation lawsuit in Georgia, filed in December 2020, in which they are alleged to have improperly challenged 364,000 voter registrations—"particularly Black and brown voters and first-time voters"—based on unreliable records of mailing address changes which, in and of themselves, are insufficient to challenge voter eligibility.[14]  Ironically, it was reported in 2017 that Election Denier Phillips was himself registered to vote in three different states.[15]  In that case, the U.S. Department of Justice joined the proceedings against the Election Deniers at the Georgia federal court's request.[16]

64.    The Election Deniers are also defendants in a civil rights lawsuit in Georgia, in which the plaintiff claims that the Election Deniers caused him to suffer threats and live in fear after their movie *2000 Mules* falsely accused him of voter fraud in connection with the 2020

---

[12] *See id.*; *see also* R.G. Ratcliffe, *Privatization role reveals ethics gap in state law*, Houston Chronicle (Jan. 2, 2005), available at https://www.chron.com/news/houston-texas/article/privatization-role-reveals-ethics-gap-in-state-law-1940898.php.

[13] Jerry Mitchell, *Voter fraud probe traced back to ex-MS welfare head*, The Clarion-Ledger (Jan. 26, 2017), available at, https://www.clarionledger.com/story/news/2017/01/26/voter-fraud-probe-traced-back-to-ex-mississippi-welfare-head/97094430/.

[14] *See Fair Fight, Inc., et al. v. True the Vote, et al.*, No. 2:20-mi-99999-UNA in the United States District Court for the Northern District of Georgia Gainesville Division.

[15] Peter Walker, *Donald Trump's electoral fraud expert Gregg Phillips was registered to vote in three states*, Independent (Jan. 31, 2017), available at, https://www.independent.co.uk/news/world/americas/donald-trump-electoral-fraud-expert-gregg-phillips-registered-to-vote-three-states-alabama-texas-mississippi-3-million-illegal-votes-a7554551.html.

[16] *See* Democracy Docket (Dec. 20, 2022), available at, https://www.democracydocket.com/news-alerts/doj-joins-georgia-voter-intimidation-lawsuit-against-right-wing-group-true-the-vote/.

COMPLAINT

1    Presidential election.  Notably, the suit accuses the Election Deniers of violating the Ku Klux Klan

2    Act and the Voting Rights Act.[17]

3         65.    It was also widely reported that the Arizona Attorney General's Office had similar

4    concerns about the Election Deniers and their unproven claims of election fraud over the course of

5    2022.  Specifically, the Election Deniers had come under fire by the Arizona Attorney General's

6    Office in connection with their false claims in the *2000 Mules* film long *before* the LA County

7    DA's Office weaponized baseless conspiracies by transforming them into frivolous criminal

8    charges.  Specifically, throughout 2022, the Election Deniers refused multiple requests from the

9    Arizona Attorney General's Office to provide evidence or data supporting the ballot-harvesting

10   allegations raised in their *2000 Mules* film.  In fact, a spokesperson for the Arizona Attorney

11   General's Office was forced to correct statements made by the Election Deniers to clarify that no

12   evidence of voter fraud had ever been presented to the office.[18]  Additionally, in May 2022, the

13   Election Deniers met with Republican Arizona lawmakers where they shared their conspiracy

14   theories about the 2020 election, but the Election Deniers again failed to present any evidence in

15   support.  Instead they asserted that those complaining about the lack of evidence are simply

16   "journalistic terrorists," and otherwise refused to explain the methodology for their investigation,

17   claiming their methods are proprietary.[19]  Accordingly, after repeated failure by the Election

18   Deniers to present any evidence of fraud, the Arizona Attorney General published an open letter in

19   October 2022, calling for a federal investigation into the Election Deniers, explaining that Arizona

20   investigators had met with the Election Deniers on multiple occasions to obtain evidence of the

21   Election Deniers' claims of wide-spread voter fraud, but no evidence of fraud was ever actually

22   produced.[20]  Instead, the Arizona Attorney General's Office expressed concerns that, given the

23

24   See *Andrews v. D'Souza, et al.*, No. 1:22-cv-04259-SDG, in the United States District Court for the Northern District of Georgia, Atlanta Division.

25   [18]See *"2000 Mules" group ignored Arizona AG's requests for info,* Axios, available at https://www.axios.com/local/phoenix/2022/09/02/2000-mules-group-ignored-arizona-ags-requests-info.

26   [19] See *Arizona Lawmakers Hear From Election Conspiracy Theorists,* US News, available at
27   https://www.usnews.com/news/best-states/arizona/articles/2022-05-31/arizona-lawmakers-hear-from-election-conspiracy-theorists.

28   [20] See Oct. 14, 2022 Letter from AG Brnovich, available at 202210141445.pdf (azag.gov).

-- 24 --

COMPLAINT

1    amount of money raised to collect alleged evidence of fraud—which apparently did not exist—and

2    given Election Denier TTV's "status as a nonprofit organization, it would appear that further review

3    of its financials may be warranted." *Id.*

4        66.    It has also been well reported that, in November 2020, the Election Deniers were

5    sued by a conservative megadonor who, after speaking with Election Denier Engelbrecht, donated

6    $2.5 million to help fund TTV's alleged efforts to fight election fraud and, specifically, to hire a

7    lawyer to file lawsuits challenging the 2020 election results.  The donor later discovered, however,

8    that his money was instead siphoned through TTV and other entities established by the Election

9    Deniers for their own personal gain.[21]   And even more telling, that same lawyer who was hired by

10   the Election Deniers (purportedly) using funds of the conservative megadonor, has since sued the

11   Election Deniers for nearly $1 million in unpaid legal fees.[22]

12       67.    And as yet another example of the Election Deniers' most recent legal troubles, the

13   Georgia State Election Board has sued Election Denier TTV for refusing to provide state

14   investigators with evidence of its claims of alleged voter fraud after it previously determined that

15   the Election Deniers' data did "not rise to the level of probable cause that a crime has been

16   committed."  Consistent with their *modus operandi*, the Election Deniers insisted that they have an

17   obligation to protect the identities of their confidential sources, "because doing so may put those

18   persons in physical or personal jeopardy"[23]—an argument identical to the one they made when they

19   refused United States District Judge Hoyt's orders to provide the identities of the persons involved

20

21   [21] *See Eshelman v. True the Vote, Inc., OSPEC Group, LLC, Engelbrecht, Bopp, Jr., Phillips, and The Bopp Law Firm*, 4:2020-cv-04034, filed November 25, 2020 in the U.S. District Court for the Southern District

22   of Texas; *see also* Richard Salame, *Was Election Denial Just a Get-Rich-Quick Scheme? Donors' Lawsuits Look for Answers* (Feb. 6, 2021), available at,

23   https://www.typeinvestigations.org/investigation/2021/02/06/was-election-denial-just-a-get-rich-quick-scheme-donors-lawsuits-look-for-answers/.

24

25   [22] *See The Bopp Law Firm, PC v. True the Vote, Inc.*, Case No. 2:23-cv-120 in the United States District Court for the Southern District of Indiana, Terre Haute Division.

26   [23] *See* Kate Brumback, *Election officials sue conservative voting group over refusal to produce ballot-harvesting evidence*, Associated Press, available at https://www.msn.com/en-us/news/other/election-

27   officials-sue-conservative-voting-group-over-refusal-to-produce-ballot-harvesting-evidence/ar-AA1dMCsB.

28

COMPLAINT

in allegedly hacking Konnech's computers (the catalyst for The Pit and the attacks against Plaintiffs), which saw them jailed for contempt of court.[24]

68.     Then, in early 2022, after the start of the Russia-Ukraine war, Election Denier Phillips began soliciting donations to allegedly bring a mobile hospital to the war-torn region in Ukraine.  Although Election Denier Phillips claimed that they were halfway to their goal of raising $25 million, lawyers for the Election Deniers were eventually forced to admit that the project had raised only $268.[25]  In fact, lawyers for the Election Deniers had said that the Election Deniers decided to abandon the project as early as April 2022, but Election Denier Phillips had continued to solicit donations for the project for months thereafter.[26]

69.     All of this information should have been known to Defendants, who were relying on the Election Deniers, as Defendants were required to determine the reliability, credibility, and suitability of the Election Deniers and the information they provided which Defendants used to indict and arrest Mr. Yu and search and seize Plaintiffs' property.

70.     Apparently realizing that their *2000 Mules* grift had run its course, and needing a scapegoat to divert attention from the FBI investigation against the Election Deniers themselves, the Election Deniers made Plaintiffs their new target, and they enlisted Defendants to do their dirty work for them.  In doing so, they invited Defendant Stevens to join them at The Pit, where they planned to publicly announce their baseless attack against Plaintiffs.

**The Pit Event**

71.     In the summer of 2022—long after they had already developed public notoriety as far-right conspiracy theorists peddling frivolous claims of election fraud—the Election Deniers advertised an invitation-only event they dubbed "The Pit," scheduled for August 13, 2022, at which they claimed they would disclose "devastating" information that would constitute definitive proof

---

[24] *See* Paul P. Murphy, *Leaders of right-wing election conspiracy group jailed after being found in contempt of court*, CNN (Nov. 1, 2022) available at https://www.cnn.com/2022/11/01/politics/true-the-vote-leaders-jail-contempt-of-court/index.html.

[25] Cassandra Jaramillo, Lauren McGaughy and Allie Morris, *Promoters of Election Lies Also Hyped a Hospital for Ukraine.  That Never Happened Either*, ProPublica (Jan. 23, 2023), available at https://www.propublica.org/article/ukraine-freedom-hospital-true-the-vote-phillips-engelbrecht.

[26] *Id.*

COMPLAINT

that the 2020 Presidential election was stolen from former President Trump.  The Pit was a clandestine event held in the desert in Arizona where attendees were shuttled on buses from a hotel to an undisclosed site and asked to put away their cell phones in Faraday bags to purportedly hide their locations.

72.     The Pit was hosted by the Election Deniers and attended by over 100 by-invitation-only guests, including Kari Lake, Christina Bobb, QAnon adherents, and other conspiracy theorists who were handpicked by the Election Deniers based on who they believed would be supportive of their conspiracy and who would best spread the disinformation they planned to disclose.  Ironically, despite efforts to conceal their identity, the Election Deniers decided to film The Pit and the audience and ultimately published a permanent record of those who attended The Pit.

73.     The event featured many different speakers, including Election Deniers Engelbrecht and Phillips, and LA County DA's Office consultant Harry Haury of Cain & Associates, and served as a pep rally for election fraud conspiracy theorists ahead of the 2022 Midterm Election.  But the main attraction for The Pit was the supposed proof that the Election Deniers claimed they planned to disclose, which was not part of *2000 Mules*, but, in their words, would serve as definitive proof that the 2020 Presidential election was stolen.

74.     Although a portion of The Pit was livestreamed by Right Side Broadcasting Network, the Election Deniers announced that they had turned off the livestream, but continued recording, before they began discussing Plaintiffs and disclosed to attendees that they had been secretly working on something they called "The Tiger Project"—the code name and hashtag for their campaign against Plaintiffs pursuant to which the Election Deniers claimed to have allegedly hacked into and downloaded U.S. Poll Worker Data from a Konnech server in China.

75.     Election Denier Phillips claimed at The Pit that in "the third week of January in 2021, . . . my [Election Denier Phillips'] guys in Dallas called me to a meeting . . . at a Hilton . . . and they had rented this room upstairs and I get there and the guys are like all just sort of weird . . . . towels under the door . . . and we pulled up on the screen . . . in essence a database.  And the database had in it, um, every bit of information you would want to know about 1.8 million Americans," including personal identifying and bank information.  Election Denier Phillips also

said at The Pit that he talks to the FBI "every other day" and that he had given them five copies of the data he claims to have stolen from Konnech, which he said amounted to "500 terabytes of information from the Chinese UNICOM backbone."

76.     As it turned out, however, the Election Deniers blatantly lied to their invited guests at The Pit.  When forced to testify under oath in a federal court in the Houston Lawsuit, Election Denier Phillips admitted that he never had a copy of any such alleged data.  Specifically, Election Denier Phillips was questioned on the stand: "Q. Did you ever have a copy of the electronic data on your computer or otherwise in your individual possession?" to which he succinctly answered "No."  Election Denier Phillips further testified under oath that he didn't access the alleged Konnech data himself, and that he never attempted to confirm that the data he was shown in that Dallas hotel room—by a person who Election Denier Phillips had only met on one prior occasion, no less—was actually Konnech data or otherwise data from a Konnech computer.  Accordingly, and as discussed further below, it begs the question how Defendants could reasonably rely on what the Election Deniers were telling Defendants about Plaintiffs when the Election Deniers admitted under oath in federal court they never even had a copy of any Konnech data, and thus could not have given a copy to Defendants as part of any investigation.

**Defendants and Election Deniers Align Themselves in a Scheme to Destroy Plaintiffs**

77.     One other particularly notable invitee to The Pit was Defendant Stevens who, as an investigator for the LA County DA's Office, was required to notify his supervisor of his law enforcement activities outside of the county.  Upon information and belief, the Election Deniers had been in prior contact with Defendant Stevens before The Pit and had disclosed to Defendant Stevens that the Election Deniers planned to publicly announce their attack against Plaintiffs at The Pit, and thus invited him as a representative of LA County in an effort to lend an air of credibility to their conspiracy.  The Election Deniers had also hoped that Defendant Stevens would share their political, racial and xenophobic beliefs and would use The Pit as an investigative opportunity and take the conspiracy about Plaintiffs back to the LA County DA's Office and ultimately charge Mr. Yu with a crime after the FBI refused to do so following a 15-month investigation of Election Deniers' accusations concerning Plaintiffs.  The Election Deniers believed that if Defendant

Stevens adhered to their beliefs, it would lend further credibility to and further spread the Election Deniers' baseless conspiracy theories, which would enhance the Election Deniers' grifting efforts under the guise of "political fundraising" in the weeks leading up to the 2022 Midterm Election.

78.     Indeed, the Election Deniers claimed at The Pit that they previously took all of their information to the FBI and made a formal complaint.  The Election Deniers in fact testified in the Houston Lawsuit that they were FBI confidential informants, and that they had been "involved in a major and mature counterintelligence operation with the FBI" investigating Election Deniers' accusations concerning Plaintiffs over the course of 15 months.  This is particularly ironic given Election Denier Phillips' Truth Social post in which he seemingly called out "confidential informants" for surreptitiously attending The Pit:



As it turned out, however, it was Election Deniers Phillips and Engelbrecht who claimed in the Houston Lawsuit that *they* were the confidential informants at The Pit.

79.     And even more ironic, and as the Election Deniers explicitly explained to The Pit attendees, including Defendant Stevens, the FBI not only declined to bring any charges against Plaintiffs for their alleged malfeasance, but it instead opened an investigation into the Election Deniers themselves for computer hacking and theft.  The Election Deniers had also admitted on at least one podcast, published before Mr. Yu's arrest, that they had taken their alleged findings about

Plaintiffs to other law enforcement agencies, including sheriffs and district attorneys, yet Defendant LA County is the only one to have taken the bait.[27]

80.     Unsurprisingly, the Election Deniers sought to use Plaintiffs as their scapegoats to turn the attention away from their own wrongdoing.  In doing so, and relying on assistance from close associates Defendants Stevens and Neff, and consultants Cain & Associates, Haury and Cain, the Election Deniers aimed to capitalize on certain public sentiment against the FBI on the heels of the then-recent raid on Mar-a-Lago, and claimed that the FBI turned the tables on them, began an investigation of the Election Deniers for hacking Konnech's protected computers and stealing its data, and that the FBI sought to conceal "Chinese infiltration of U.S. Election software," as reflected in this Truth Social Post "ReTruthed" (the Truth Social equivalent of a Retweet) by Election Denier Phillips more than a month prior to Mr. Yu's arrest:



81.     After The Pit, the Election Deniers went on a media blitz where they claimed that they were working with people "to bring this work to, to a grand jury for the first time," and that they have the "support of, of a major prosecutorial office in the United States . . . and [that] they are moving this along."  While Plaintiffs had no way to know this at the time, in hindsight, it is now

---

[27] *See* Sept. 5, 2022 Election Deniers' Podcast, available at, https://rumble.com/v1iudmy-the-tiger-project-how-the-ccp-is-breaching-us-elections-sept-5.html.

clear that the Election Deniers were speaking about their investigation into Plaintiffs with Defendants, which Defendants were required to maintain as confidential.

82.     This is also apparent, in hindsight, in other Truth Social posts by the Election Deniers more than a month before Mr. Yu's arrest:





83.     Sadly, despite knowing exactly who the Election Deniers were and having full knowledge of the thoroughly debunked nature of the Election Deniers' previous claims of election malfeasance, Defendants—either because they shared the Election Deniers' disproven beliefs, or because they simply wanted to capitalize on public furor created by the Election Deniers in order to make their own headlines—maliciously and/or recklessly opened a rigged investigation against

1    Plaintiffs based solely on the Election Deniers' baseless conspiracy theories, without probable

2    cause, and in a clear abuse of power.

3           84.    Defendants knew or should have known that what they were doing represented an

4    abuse of their powers, a dereliction of their code of ethics, and a violation of LA County policies

5    that prohibit discrimination and engaging in any deceit or intentional misrepresentation, and that

6    required Defendant Stevens to never act officiously or permit personal feelings, prejudices, or

7    political beliefs, aspirations, animosities or friendships to influence his decisions.  The notion that

8    a vast international conspiracy concerning the U.S. Presidential election would be ignored by the

9    FBI, other law enforcement agencies, and the LA County Registrar, yet proven by infamous and

10   thoroughly debunked armchair conspiracy theorists and con artists posing as investigators using

11   basic internet searches and posts on social media, demonstrates that Defendants were motivated by

12   politics, headlines, and personal gain rather than probable cause.

13   **Konnech Sues the Election Deniers**

14          85.    Less than a month after The Pit, on September 12, 2022, Konnech filed suit against

15   the Election Deniers for, among other things, hacking, theft, and defamation.  That same day,

16   Konnech obtained a temporary restraining order against the Election Deniers which required them

17   to identify everyone that was involved in allegedly accessing Konnech's servers and prohibited

18   them and those acting in concert with them from, among other things, hacking Konnech's

19   computers or taking its data.

20          86.    A hearing on Konnech's motion for preliminary injunction was initially set for

21   September 26, 2022.  The Election Deniers, however, sought to delay the hearing on more than one

22   occasion, feigning unavailability until "after October 5, 2022," a date after which they knew Mr.

23   Yu would be arrested.  Accordingly, without knowledge of the imminent arrest, Konnech agreed

24   to continue the hearing on its preliminary injunction until "a date after October 5, 2022 when [the

25   Election Deniers] represented they w[ould] be available for a hearing."  But as it turned out, the

26   Election Deniers were merely delaying until the date that they knew Defendants would unlawfully

27   arrest Mr. Yu so that they would not be forced to testify and reveal that they had no evidence of

28   their claims.  To be clear, because it was Konnech's burden to demonstrate contempt and the right

1    to a preliminary injunction, by arresting Mr. Yu and preventing him from testifying, the Election

2    Deniers knew that they would not have to take the stand to testify.

3          87.    Indeed, on the morning of October 4, 2022, a lawyer for the Election Deniers

4    emailed lawyers for Konnech and stated their intent to appear at the hearing on the preliminary

5    injunction, and then taunted Konnech by stating it was "important and fundamental to the issues

6    before the Court for . . . Mr. Yu to be present in person to testify," and requested Konnech's

7    agreement to make Mr. Yu available for the hearing.  Of course, the Election Deniers knew what

8    was happening.  They knew that Defendants would arrest Mr. Yu would that morning, which is

9    why they wanted to push the hearing until *after* his arrest; Defendants were keeping the Election

10   Deniers informed about exactly what was going to happen, and when it was going to happen.

11   **Mr. Yu is Wrongfully Arrested and His Home, Vehicle and Offices Are Raided; Defendants**

12   **Attempt to Interfere in the Houston Lawsuit**

13         88.    Shortly after Konnech's lawyers received the email from the Election Deniers'

14   lawyer, and while Mr. Yu was on his way to the airport to fly to Houston and meet with his attorneys

15   to prepare for the October 6 hearing, Mr. Yu was arrested.  Simultaneously, but only after Mr. Yu

16   was already in custody and had already handed over the keys to enter his house, LA County and

17   law enforcement personnel in Michigan—working in conjunction with each other, and with law

18   enforcement personnel in Michigan operating as an arm of Defendant LA County at the direction

19   of the LA County DA's Office's Bureau of Investigation, specifically including Defendant

20   Stevens—approached Mr. Yu's home in the Meridian Charter Township with weapons drawn, and

21   then used a battering ram to force their way into his home even though they encountered no

22   resistance and despite the fact that Defendants knew before they entered the home that Mr. Yu's

23   wife had called 911 from inside the house to report what she believed was a home invasion in

24   progress.[28]

25

26

27   _____

[28] Defendants were specifically required to conduct searches with due regard and respect for private property

28   interests and first attempt to obtain keys, combinations or access codes for the search of locked property
     before using forcible entry.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   89.    Defendants treated Mr. Yu as if he were a violent criminal when, in reality, Mr. Yu

16   was ultimately charged with nothing more than a purported breach of a contract to which he wasn't

17   even a party.

18   90.    While at Mr. Yu's home, law enforcement seized his personal laptops, thumb drives,

19   notebooks, hard drives, memory cards, RSA keys, and cell phones, in addition to other personal

20   property.  But, without presenting Mr. Yu's wife with a copy of the search warrant, law enforcement

21   first seized Mr. Yu's wife's phone and laptop, forcing her to write down passwords for both, then

22   confiscated those devices until the search was completed, and further refused her request to call her

23   attorney.  The seizure also included information and data that pre-dated Konnech's contractual

24   relationship with LA County and thus could not have any relevance to the criminal charges asserted

25   in connection to that relationship.  To date, none of the property seized from Mr. Yu's home has

26   been returned.

27   91.    After being arrested, Mr. Yu informed law enforcement of his attorney's name and

28   asked to make a phone call, but he was prohibited from doing so.  Mr. Yu's wife, who was not told

-- 34 --

COMPLAINT

where her husband was being taken, spent the entire day trying to find him with no success. Ultimately, she was able to contact an attorney on her own after her phone was finally returned many hours later, and that attorney eventually located Mr. Yu in the middle of the night, more than 15 hours after he was arrested.

92.    That same day, the LA County DA's office, along with its "consultants" Cain and Haury of Cain & Associates and law enforcement personnel in Michigan operating as an arm of Defendant LA County at the direction of the LA County DA's Office's Bureau of Investigation, specifically including Defendant Stevens, also raided Konnech's two offices in Michigan located in the Meridian Charter Township and East Lansing, Michigan.  There, Defendants intimidated Konnech's employees, subjected them to interrogation, and proceeded to take each and every piece of computer equipment from the company, without regard to its contents, relevance, or date of the materials—including information and data relating to wholly irrelevant time periods for which no probable cause could possibly exist, including time periods pre-dating Konnech's contractual relationship with LA County that did not begin until Konnech executed its contract with LA County on or about October 20, 2020—, and in violation of LA County policies acknowledging that since a computer belongs to a business it may not be feasible to seize the entire computer and that it may be possible to perform an on-site inspection, or to image the hard drive only.

93.    To be clear, Defendants took *all* of Konnech's equipment, including 12 computer servers, 14 hard drives, laptops, desktops, workstations, and firewall equipment.  In total, Defendants seized approximately 350 Terabytes of data, including all privileged email communications with Plaintiffs' counsel and substantial information and data relating to time periods that pre-date Konnech's contractual relationship with LA County.  Defendants' seizure of Konnech's equipment and data was particularly damaging given that the 2022 Midterm Election was only one month away.

94.    While the arrest, search, seizure and detention were purportedly based on a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, including, without limitation:

COMPLAINT

- Intentionally and maliciously relying on, and/or acting with reckless disregard for the truth of, the fabricated nature of the Election Deniers' claims that formed the entire basis for Defendants' investigation;

- Acting with knowledge that the Election Deniers were publicly known to be discredited conspiracy theorists who were not reliable, credible, suitable or trustworthy;

- Acting with knowledge that the Election Deniers were being investigated by the Arizona Attorney General's Office in connection with false claims of election fraud, and that repeated failures to provide any evidence of alleged voter fraud led the Arizona Attorney General's Office to call for a federal investigation into the Election Deniers and their status as a nonprofit organization;

- Acting with knowledge that the Election Deniers had presented these same frivolous claims about Plaintiffs' supposed election malfeasance to the FBI and other law enforcement agencies that chose not to pursue any charges against Plaintiffs, and that the FBI had investigated the Election Deniers' accusations concerning Plaintiffs for 15 months and had instead chosen to open an investigation into the Election Deniers for computer hacking and theft of the personal identifying information of U.S. poll workers;

- Acting with knowledge that Defendant Stevens had personally attended The Pit event held by the Election Deniers, which was advertised as an event where the Election Deniers would supposedly reveal "devastating information" to definitively prove that the 2020 U.S. Presidential election was stolen, but was instead used to publicize fabricated conspiracy theories about Plaintiffs;

- Acting with knowledge that Defendant Neff had personally reached out to the Election Deniers, despite the fact that other baseless conspiracies concocted by the Election Deniers had already been publicly challenged in courts and by the Arizona Attorney General's Office;

- Retaining consultants Cain and Haury of Cain & Associates and having them participate in the raids on Mr. Yu's home and Konnech's business offices even though Cain and Haury are known to be close associates of the Election Deniers, with Haury appearing on stage as a speaker at The Pit event (which was attended by Defendant Stevens) during which he demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," and even though Haury previously testified as a fact witness before the grand jury and Defendants had at their disposal the fourth largest law enforcement agency in the county with over 300 employees, including their own forensic computer experts;

- Intentionally concealing the close ties that Defendants Stevens and Neff, as well as consultants Cain and Haury of Cain & Associates, had with the Election Deniers and their attempts to fabricate and monetize baseless

-- 36 --

COMPLAINT

conspiracy theories about election fraud generally—and about Plaintiffs specifically—to obscure the political bias and lack of any true investigation before obtaining warrants despite the lack of any probable cause; and

- Seizing information and data that pre-dated Konnech's contractual relationship with LA County and thus could bear no relevance whatsoever to any criminal charges asserted against Mr. Yu.

95.     Defendants knew or should have known that the Election Deniers and the information they provided were unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause.  Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

96.     Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth.  Based on the totality of the circumstances, no reasonably prudent person could have concluded that probable cause existed based on the information provided.  This is only further evidenced by the fact that, on information and belief, Defendant Neff was subsequently placed on administrative leave and the criminal charges were voluntarily dismissed as a result of potential bias in Defendants' presentation and investigation of the evidence, and in what the *Los Angeles Times* has called a "questionable prosecution" of Mr. Yu.[29]  Indeed, according to statements made by consultant Cain on a September 7, 2023, podcast, it was Defendant Neff that "was the one that pressed forward with things," apparently referring to the prosecution of Mr. Yu and the search and seizure of Plaintiffs' property.

97.     Meanwhile, Defendant Gascón sought to capitalize on the events by calling for and holding a press conference immediately after Mr. Yu's arrest and then putting out a press release,

---

[29] James Queally, *L.A. Prosecutor put on leave of questionable case sparked by election conspiracy theories*, Los Angeles Times (Nov. 22, 2022), available at, https://www.latimes.com/california/story/2022-11-22/l-a-prosecutor-placed-on-leave-over-bungled-case-sparked-by-election-conspiracy-theories.

-- 37 --

that ran on the newswire for all media channels to pick up, offering scant details about the investigation and accusing Konnech of stealing and storing personal identifying information on Chinese servers.[30]  The publicity stunt worked.  The press conference and press release were widely disseminated both locally and nationally, by Defendants themselves on the LA County DA Twitter page and elsewhere.[31]



98.     At the press conference, Defendant Gascón stated that Mr. Yu was "taken into custody" "in connection with the theft of personal identifying information of election workers." But, as reflected in the criminal complaint ultimately used to charge Mr. Yu, no such charges of theft were alleged.  Defendant Gascón also stated that the personal identifying information at issue "was stored on servers in the People's Republic of China."  Again, however, the criminal complaint makes no mention whatsoever of a server located in China.  Defendant Gascón also failed to mention that the charges against Mr. Yu were based on information provided by the Election Deniers and their associates, Defendant Stevens, Defendant Neff, and consultants Cain &

---

[30] *See October 4, 2022: Head of Election Worker Management Company Arrested in Connection with Theft of Personal Data,* Los Angeles County District Attorney's Office (Oct. 4, 2022), available at, https://da.lacounty.gov/media/news/head-election-worker-management-company-arrested-connection-theft-personal-data.

[31] *See* https://vimeo.com/756956667.

COMPLAINT

Associates, including Haury who had testified as a purported fact witness before the grand jury. Defendant Gascón also failed to mention that, as his spokesperson later confirmed, much of the information Defendant Gascón provided at the press conference came from "employees closest to the investigation,"[32] meaning Defendant Stevens and Neff.  In other words, Defendant Gascón failed to conduct any meaningful investigation himself, and served as a rubber stamp to publicly, maliciously and recklessly tout the charges that Defendants Stevens and Neff had fabricated in a joint operation with the Election Deniers.

99.    Mere hours after Mr. Yu's arrest, the Election Deniers released a press statement, which also ran on the newswire for all media to pick up, taking credit for Mr. Yu's arrest, claiming they "played a small role," and applauding "the Los Angeles District Attorney's office for their thorough work and rapid action in this matter."  Then, when someone asked Phillips "How in the world did you all get progressive DA Gascóne [sic] on board," Phillips simply replied "Patriot Games."[33]



---

[32] James Queally, Sarah D. Wire, *How did Gascón end up launching a criminal probe sparked by far-right election conspiracy theories?*, Los Angeles Times (Nov. 16, 2023), available at https://www.latimes.com/politics/story/2022-11-16/gascon-targeted-poll-worker-registration-company-at-heart-of-conspiracy-theories.

[33] The term "patriot games" is a term often used by the Election Deniers as a catchphrase to describe their election fraud-related activities, and to paint a picture that the country is under attack and that what they are doing is cloaked in patriotism.  It is also the name of Election Denier Phillips' podcast.

COMPLAINT

1       100.    Despite the arrest, Konnech's civil action against the Election Deniers continued.

2    At an October 6, 2022, hearing on a preliminary injunction in the Houston Lawsuit, counsel for the

3    Election Deniers "begged" District Judge Hoyt to call the LA County District Attorney to discuss

4    Mr. Yu's arrest in an effort to prevent the preliminary injunction hearing—which would reveal the

5    Election Deniers' contempt for the Judge's orders—from proceeding.  Judge Hoyt, however,

6    expressed his frustration with the Defendants' interference with the Houston Lawsuit and described

7    how "[w]e are not having a hearing [i.e., the preliminary injunction hearing] because [Mr. Yu] has

8    been arrested by people who are intent on flipping the script."  Judge Hoyt reiterated his concern

9    that Defendants "may be obstructing justice by what they have done."  The October 6 hearing

10    proceeded and the Election Deniers' attorney was ordered to provide the names of everyone that

11    was involved in allegedly accessing the U.S. Poll Worker records at the heart of the lawsuit.  The

12    Election Deniers' attorney provided a single name which, as was later discovered, was not the only

13    other person involved and therefore did not comply with Judge Hoyt's order.

14    **Mr. Yu is Subjected to Unwarranted Detainment and Restrictions**

15       101.    Because Mr. Yu was arrested in Michigan but charged in LA County, Mr. Yu would

16    need to appear in LA County for his arraignment.  But, in a further clear attempt to maximize its

17    political spectacle, the LA County DA's Office declined Mr. Yu's offer to voluntarily appear in

18    Los Angeles at his arraignment in order to force Mr. Yu to undergo an unnecessary and costly bail

19    hearing and extradition proceeding in Michigan.  Then, after Mr. Yu prevailed in Michigan, he had

20    to face yet another arraignment and bail hearing in LA County on October 12, 2022.  However,

21    when he voluntarily appeared for the arraignment and bail hearing on October 12, 2022, the LA

22    County DA's Office indicated that it was not prepared to proceed at the time.  After waiting two

23    days for the LA County DA to prepare, the arraignment and bail hearing finally was held on October

24    14, 2022.

25       102.    But first, to add insult to injury, prosecutors with the LA County DA's Office tried

26    to use Mr. Yu as a prop by instructing law enforcement to shackle and "perp-walk" him through

27    the courtroom even though, by that point, Mr. Yu had already voluntarily sat in that same courtroom

28    for two days awaiting his arraignment.  All of this conduct was part of the political charade that the

LA County DA's Office was knowingly orchestrating with the Election Deniers. Fortunately, however, Mr. Yu's defense lawyer understood what Defendants were trying to do and refused to allow Defendants to carry on with their charade.

103.    When Mr. Yu was finally arraigned, Defendants, upon direct orders from Defendant Gascón himself, abandoned the original sealed indictment on which his arrest and the search and seizure had been based, and instead decided to proceed with a new criminal complaint. In other words, Defendants knew there was a problem with the indictment and that, if the indictment was unsealed, they would be forced to reveal the unreliable, not credible and untrustworthy sources of their "investigation" (i.e., the thoroughly debunked Election Deniers' baseless conspiracy theories), the lack of any actual evidence of any supposed data breach, and the lack of any probable cause underpinning the unlawful arrest, search, seizure and detention of Plaintiffs and their property. Defendants instead drafted a new criminal complaint that was devoid of any reference to the Election Deniers and their rampant involvement with the investigation and prosecution of Mr. Yu. But instead of providing Mr. Yu and his defense counsel with a copy of the complaint as soon as it was ready, Defendants first leaked a copy of the complaint to national media, including the *New York Times*.

104.    After significant delay, Plaintiffs finally received a copy of the criminal complaint against Mr. Yu, which was signed by the Election Deniers' associates, Defendants Stevens and Neff. That criminal complaint was legally untenable on its face. While Defendant Neff had previously claimed in open court that the charges against Mr. Yu stemmed from one of the "largest data breaches in United States history," the complaint failed to allege any such crime. Instead, the complaint attempted to plead that Mr. Yu embezzled public funds paid to Konnech pursuant to Konnech's contract with LA County because, according to Defendants, poll worker data was stored in a manner that violated the contract. In other words, the complaint alleged nothing more than a purported civil breach of contract by Konnech—not Mr. Yu, who was not a party to that contract in any event—even though a breach of contract unquestionably does not constitute a crime and even though LA County had indisputably received all services called for under that contract.

1    105.    Regardless, the charges against Mr. Yu were based on information Defendants

2    obtained from the Election Deniers, who later testified under oath in the Houston Lawsuit that they

3    themselves did not access the alleged Konnech data, that they never even had a copy of any alleged

4    Konnech data or U.S. Poll Worker Data, and that they did nothing to confirm that the data actually

5    belonged to Konnech or otherwise came from a Konnech computer.  Specifically, Election Denier

6    Phillips was questioned on the stand: "Q. Did you ever have a copy of the electronic data on your

7    computer or otherwise in your individual possession?" to which he succinctly answered "No."

8    Accordingly, Defendants simply took infamous and thoroughly debunked conspiracy theorists at

9    their word, which was already widely known as unreliable, given that the Election Deniers admitted

10   under oath in federal court they never even had a copy of any Konnech data, and thus could not

11   have given a copy to the Defendants as part of any investigation.

12   106.    At the bail hearing immediately following the arraignment, the LA County DA's

13   Office incredibly argued that Mr. Yu—who has no criminal history whatsoever and who had

14   already surrendered his passport—should be denied bail because, consistent with the Election

15   Deniers' and Defendants' shared political, racist and xenophobic views, Mr. Yu had connections

16   to China since he was born there.  Defendants' refusal to agree to Mr. Yu's release on bail further

17   demonstrated their nefarious intent behind the prosecution.

18   107.    Eventually, Mr. Yu's bail restrictions were revised, and he was released from jail.

19   However, Mr. Yu was forced to wear two ankle monitors—one for Michigan, and one for Los

20   Angeles—and was detained under house arrest some 2,200 miles from his home in a Los Angeles

21   hotel, the confines of which he was not permitted to leave except to meet with his defense lawyer.

22   Plaintiffs incurred substantial costs in connection with Defendants' unlawful arrest, search and

23   seizure of Mr. Yu and Konnech, including, without limitation, attorneys' fees in both Michigan and

24   California, travel costs between Michigan and California, and housing costs in California while Mr.

25   Yu was held on house arrest in a Los Angeles hotel for approximately one month.

26   108.    Another unwarranted restriction placed on Mr. Yu was a prohibition on him

27   communicating with Konnech's employees or doing any business on its behalf.  So, not only did

28   Defendants seize all of the equipment Konnech needed to operate its election logistics software

-- 42 --

COMPLAINT

1   business, they prohibited its CEO from assisting with the crisis management of the company that

2   Defendants' actions put in dire straits just as it needed to operate at full capacity to fulfill its

3   customer contracts with the 2022 Midterm Election mere weeks away.

4   **The Election Deniers Are Found in Contempt and Jailed**

5        109.    On October 27, 2022, Judge Hoyt held a show cause and contempt hearing at which

6   the Election Deniers were ordered to appear and show cause to avoid being held in contempt of the

7   Court's temporary restraining order.  At that hearing, the Election Deniers' lawyers told Judge Hoyt

8   that Mr. Beaart "has asked for the opportunity to address the Court by telephone directly off the

9   record, either in camera or in a sealed courtroom, to explain that Mr. Yu, the CEO of Konnech, is

10  facing multiple felony charges in Los Angeles[.]"  Recognizing the impropriety involved, Judge

11  Hoyt stated that it "is quite unusual for a district attorney to want to talk to me about anything" and

12  that he would not permit Mr. Beaart "to interfere in the proceedings in this case" or to conduct any

13  of the proceedings in secret.  Defendants' consultant, Nate Cain of Cain & Associates, was also

14  present at the hearing and was "prepared to testify" in open court concerning Defendants'

15  "investigation" and to disclose information he claimed to have found in connection with the

16  execution of the search warrant on Plaintiffs' home and offices.[34]

17       110.    Ultimately, in the Houston Lawsuit, the Election Deniers were held in contempt of

18  court and jailed in a federal detention center for refusing to comply with Judge Hoyt's order to

19  identify all persons involved with allegedly hacking into Konnech's system and stealing its data—

20  the very source of the information serving as the supposed basis for Defendants' indictment of Mr.

21  Yu.  Rather, consistent with their longstanding pattern of not being able to back up their frivolous

22  claims of election fraud in the 2016 and 2020 Presidential elections (as discussed above), the

23  Election Deniers claimed they could not identify their other conspirator because he was an FBI

24  confidential informant.  But tellingly, when the FBI was contacted about the information ordered

25  to be disclosed, the FBI stated that it was not interested in protecting the information.  Furthermore,

26  when pressed under oath as to whether the Election Deniers ever had any of the 1.8 million records

27
28  [34]  *See* Live Tue Night Bible Study with Nate D Cain (Nov. 16, 2022), available at, https://rumble.com/v1ut2rs-live-tue-night-bible-study-with-nate-d-cain.html.

of U.S. Poll Worker Data allegedly stored on a Chinese server at the center of the Houston Lawsuit and the LA County DA's arrest and search warrant, the Election Deniers admitted, consistent with their past claims of election fraud in Arizona and Georgia, that they never had possession of it and could not produce a copy of it.  In other words, the Defendants arrested Mr. Yu and sought to hold him without bail, and searched and seized Plaintiffs' computers and equipment and still hold them to this date, because they took the Election Deniers at their word despite their obvious lack of credibility and admission that they do not actually possess the most important piece of evidence that they claimed would support Defendants' actions against Plaintiffs.  And, based on Defendants' criminal complaint against Mr. Yu—which was filed nine days after Defendants seized all of Plaintiffs' computers and equipment—Defendants knew at the time they criminally charged Mr. Yu that they did not possess any evidence to support their original charge that Plaintiffs had stored U.S. Poll Worker records on a server in China.  Indeed, the criminal complaint makes no mention whatsoever of a server located in China.

**Defendants Tried to Hide their Affiliation With the Election Deniers**

111.    In a clear attempt to conceal their wrongdoing, Defendants intentionally hid their close affiliation with and reliance on the Election Deniers.  When a spokesperson for the LA County DA's Office was questioned about the Election Deniers' involvement shortly after Mr. Yu's arrest, the spokesperson initially claimed Defendants were unaware of the Election Deniers' investigation and stated that the Election Deniers had no input into Defendants' investigation.[35]  Only after the baseless charges against Mr. Yu were voluntarily dismissed did Defendants later confirm that a tip from Election Denier Phillips had sparked their inquiry into Mr. Yu and Konnech, though Defendants attempted to downplay the Election Deniers' actual involvement.[36]

---

[35] *See* Natalia Contreras, *Federal judge demands True the Vote identify who provided access to poll worker data*, VoteBeat Texas (Oct. 7, 2022), available at https://texas.votebeat.org/2022/10/7/23393718/true-the-vote-konnech-lawsuit-data-china.

[36] *See* Juma Sei, *LA County drops charges against election software executive, citing 'potential bias'*, National Public Radio (Nov. 10, 2022), available at https://www.npr.org/2022/11/10/1135839608/los-angeles-county-dropped-charges-konnech-true-the-vote.

COMPLAINT

1        112.    But the Election Deniers subsequently testified in the Houston Lawsuit that they had

2 assisted the Defendants with their investigation of Plaintiffs and prosecution of Mr. Yu after

3 Defendant Neff reached out to them to discuss Plaintiffs, and after Defendant Stevens and

4 consultant Haury attended The Pit.  They also testified that they had spoken with Defendants

5 multiple times about the investigation and Konnech.  Moreover, Election Denier Phillips claimed

6 in a legal filing in the Houston Lawsuit that he was called to testify before the LA County grand

7 jury that indicted Mr. Yu.

8 **Defendants Dismiss the Charges Against Mr. Yu After the Election, Admit Bias in their**

9 **Investigation, and then Suspended Defendant Neff Because of His Conduct in Connection**

10 **with the Investigation**

11        113.    Because no actual criminal violation was alleged in the new criminal complaint, Mr.

12 Yu filed a motion to dismiss the charges that Defendant LA County had leveled against him.

13        114.    The motion to dismiss thus highlighted the unmistakable facts that (1) Mr. Yu was

14 not a party to the contract with LA County; (2) the payments made under the contract were made

15 to Konnech (not Mr. Yu), and those funds were used by Konnech (not Mr. Yu) to cover payroll and

16 other expenses incurred by Konnech while performing its contractual duties for the services it

17 indisputably provided to LA County under that contract; and (3) the complaint failed to identify

18 any criminal conduct but merely alleged a technical breach of contract.  Quite simply, the motion

19 to dismiss made clear that Konnech's alleged failure to comply with a contractual data security

20 provision of its contract with LA County was not a basis to prosecute Mr. Yu for embezzlement.

21        115.    Instead of defending the charges, on the day after the 2022 Midterm Election—and

22 thus after the Election Deniers and Defendants had lost any plausible grounds to continue their

23 supposed "political fundraising" to help uncover evidence of Plaintiffs' supposed election

24 malfeasance as part of that election—Defendants decided to voluntarily drop all charges against

25 Mr. Yu.  But not only did Defendants drop the charges, in the days thereafter the LA County DA's

26 Office made astonishing admissions about the political motivation behind the prosecution and how

27 the investigation had not followed normal protocols.

28

116.     Specifically, speaking only to a journalist in print media rather than through a press release or press conference of any kind—which was Defendants' chosen channel of communication when announcing the arrest of Mr. Yu—a spokesperson for the LA County DA's Office said: "During the course of this prosecution, upper-level management became aware of irregularities in how the case was presented."  Specifically, she explained, "we are concerned about both the pace of the investigation and the *potential bias in the presentation and investigation of the evidence*."

117.     And importantly, knowing that what had happened to Mr. Yu was illegal, the LA County DA's Office placed Defendant Neff on leave due to his role in the investigation and prosecution of Mr. Yu.  The *Los Angeles Times* confirmed that this leave was connected to Defendant Gascón's decision to drop the charges against Mr. Yu, and further expressly noted that in the previous news conference announcing the charges, Defendant Gascón "did not mention that his office's investigation was sparked by a conversation with one of the founders of [Election Denier TTV]," and that "[t]he district attorney's office has previously sought to downplay [Election Denier TTV's] role in the investigation."[37]

118.     On information and belief, Defendants knew or should have known that the LA County DA's Office intentionally presented evidence in a biased manner, which was intentionally and recklessly ignored by Defendant Gascón and the other Defendants for their own personal gain, all of which led to the wrongful arrest of Mr. Yu and the wrongful search and seizure of Mr. Yu's and Konnech's property.

**Konnech's Lawsuit Against the Election Deniers Uncovered that Defendants Hired the Election Deniers' Adherents to Assist with the Investigation and Accompany the Raid**

119.     As Konnech's civil lawsuit against the Election Deniers progressed, the political and racial bias in Defendants' investigation and prosecution of Mr. Yu became even more apparent. On February 24, 2023, the Election Deniers filed a motion in the Houston Lawsuit to obtain a mirror image copy of all ~350 Terabytes of data Defendants seized from Konnech in their raid.  As part

---

[37] James Queally, *L.A. Prosecutor put on leave of questionable case sparked by election conspiracy theories*, Los Angeles Times (Nov. 22, 2022), available at, https://www.latimes.com/california/story/2022-11-22/l-a-prosecutor-placed-on-leave-over-bungled-case-sparked-by-election-conspiracy-theories.

COMPLAINT

of that motion, the Election Deniers included an affidavit of consultant Haury, the purported CEO of Cain & Associates, who testified that "Cain & Associates was tasked with assisting the LA County DA's Office Bureau of Investigation in the execution of the court-ordered search warrant" where he "coordinated the physical search for the devices, along with Andrew Stevens, LA County's investigator." Consultant Cain, the founder of Cain & Associates, has confirmed that Defendant Neff had directly hired Cain & Associates for the job, but only after, as confirmed by Haury, that Haury had testified before the grand jury that indicted Mr. Yu and recommended that LA County hire Haury and Cain & Associates.[38] The Haury affidavit also made the shocking admission that, after Defendants had seized and begun imaging all of Konnech's equipment, Haury hacked into Konnech's internet-connected e-mail accounts and conducted an illegal wiretap by monitoring those accounts for four days *after* the search warrant was executed, all apparently for the purpose of furthering the Election Deniers' and Defendants' shared political, racial and xenophobic goals, and to monitor after-the-fact communications, including attorney-client privileged communications.

120.  Upon further investigation, it became clear that Haury, Cain, and Cain & Associates—who claim to have spent in excess of 600 hours working on the investigation with Defendants—were not independent. Rather, they had significant ties to the Election Deniers, with Haury and the Election Deniers hiring the same lawyers to represent them in connection with the Houston Lawsuit, and were adamant proponents of their conspiracy theories concerning Plaintiffs in furtherance of their shared political, racial and xenophobic beliefs. Haury, in fact, appeared on stage as a speaker at The Pit where he spoke about his theories on CCP interference in U.S. elections, demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," and even solicited people to send money to the Election Deniers while giving an interview to One America News Network.[39] Haury also recently admitted on a podcast that he testified as a

---

[38]  *See* 4/14/2023 Prather Point: Jeffrey Prather ft. Nate Cain, BrighteonTV, https://www.brighteon.com/e05cd685-e5e6-403c-9a04-22a0104366d5 (segment at 22:10)

[39] *See* Media Matters, OAN (August 15, 2022), available at, https://www.mediamatters.org/media/3994024) (Segment from 3:25 to 4:13).

fact witness before the grand jury that indicted Mr. Yu—which he said was done in a "hurry"—and that Cain & Associates was hired by LA County after such testimony and upon Haury's own recommendation.[40]

121.    Additionally, and in what should have been another giant red flag to Defendants, consultant Cain, the founder of Cain & Associates, previously had his own home raided by the FBI for allegedly stealing federal property while he was an FBI contractor.[41]  Consultant Cain's political motives are further revealed by his previous filings in other lawsuits and his statements on several podcasts.  For example, Cain filed an "expert report" in connection with an Arizona lawsuit, in which he brazenly claimed that the results of the 2020 Presidential election were fraudulent and should not be certified.  Additionally, on October 31, 2022, the date the Election Deniers were jailed for contempt, consultant Cain appeared on a podcast during which he also solicited people to send money to the Election Deniers and implicitly threatened Judge Hoyt using scripture from the Bible with the conclusion that it could "end badly for him [Judge Hoyt]."[42]  Indeed, Cain, who is now running for a West Virginia seat in the U.S. Congress, has appeared on QAnon podcasts, such as the "MG Show," where he has espoused his far right-wing conspiracy theories.

122.    Now, realizing what Defendants had done and who they aligned themselves with in investigating and prosecuting Mr. Yu, Defendants have apparently refused to pay Cain & Associates for their work on the investigation.  As a result, Cain has declared that he intends to publicly release his investigative report, which is particularly concerning given that Defendants have admitted that they failed to execute any confidentiality or non-disclosure agreement with Cain & Associates.

---

[40] *See Bill Barr Stopped Bethpage Ballot Trafficking Investigation*, CDM (Sept. 11, 2023), available at, https://rumble.com/v3gwp6q-livestream-7pm-est-bill-barr-stopped-bethpage-ballot-trafficking-investigat.html.

[41] *See* Richard Pollock; *FBI Raids Home of Whistleblower On Clinton Foundation, Lawyer Says*, Daily Caller (November 29, 2018), available at, https://dailycaller.com/2018/11/29/fbi-whistleblower-clinton-uranium/.

[42] *See Texas Judge Jails Gregg & Catherine for Protecting FBI CHS w/ Nate Cain*, Red Pill News (Oct. 31, 2022), available at https://rumble.com/v1qrmsg-judge-threatens-gregg-and-catherine-with-jail-for-not-breaking-federal-law-.html (Segment from 36:43 to 38:30).

**Defendants Have Wrongfully Converted Konnech's Equipment**

123.     Ever since their servers, computer equipment and other property were seized over eleven months ago, Plaintiffs have sought the return of that property.  Despite the fact that Plaintiffs' computer equipment was seized without probable cause and on the basis of an invalid warrant premised on the testimony and so-called-investigation of the unreliable Election Deniers, Defendants have refused to return Plaintiffs' computer equipment and servers, claiming that they are struggling to properly assess the data and map the data that they contain.  Defendants' actions are in stark contrast to and contradicted by the statements made by Chief Robert Arcos with the Los Angeles County Bureau of Investigation at Defendant Gascón's press conference following Mr. Yu's arrest, during which he touted Defendants' forensic computer expertise, how they are the fourth largest law enforcement agency in the county with over 300 employees, how diligently they work, and that they are the finest in the profession.  Mr. Arcos' comments also highlight the ridiculousness in hiring consultants Haury and Cain as purported forensic experts, and in relying on the Election Deniers to conduct the investigation for Defendants.

124.     Notwithstanding repeated demands to have the seized items returned on October 15, 18 and 26, 2022, the LA County DA's office refused to commit to a timeline to return the items. On November 16, 2022, after the criminal complaint against Mr. Yu was dismissed, the Los Angeles County Superior Court granted Plaintiffs' motion for return of the property.

125.     Despite that order, Defendants still have not returned Plaintiffs' property, and instead waited until April 25, 2023, to provide Plaintiffs with two external hard drives of forensically encrypted data which Defendants claim contain copies of the contents of Mr. Yu's personal laptop, cell phone and other external electronic storage devices—but not Mr. Yu's personal laptop, external electronic storage devices or Konnech's data.

126.     To date, however, Mr. Yu, has been unable to access his personal data that was returned due to its forensic encryption which Plaintiffs are unable to access without their original computer hardware which Defendants refuse to return to Plaintiffs.  And although Plaintiffs pressed for the return of all of their equipment and data at Court hearings in Los Angeles County Superior

1  Court on November 22, 2022, December 2, 2022, December 7, 2022, January 9, 2023, February 9,

2  2023 and March 2, 2023, the LA County DA's office has not returned *any* of the seized items.

3      127.   To this date, Defendants still refuse to return the actual original equipment that

4  Plaintiffs need to access and utilize the data.  To be clear, without having its computer equipment

5  and hardware, Plaintiffs cannot access the data or host the data even if it were unencrypted.  LA

6  County refuses to provide the equipment based on the ruse that it cannot be certain that its copy is

7  accurate, yet it asks Plaintiffs to rely on a potentially inaccurate copy without the necessary

8  equipment to host the data.  The Deputy District Attorney in charge of the investigation has since

9  refused to provide a time frame for the return of Plaintiffs' equipment and, instead, claims that "it

10  will be some time" before the equipment will be returned to Plaintiffs.  Plaintiffs have incurred

11  substantial costs attempting to overcome the unlawful seizure and obtain the return of the seized

12  property, including the cost of replacement computer equipment to permit Plaintiffs' business to

13  continue to operate as well as attorneys' fees attempting to compel Defendant LA County to return

14  the unlawfully seized equipment.

15  **Defendants' Rampant Hypocrisy is Demonstrated by the Fact that LA County Still Uses**

16  **Konnech for its Election Logistics Software**

17      128.   Defendants' malicious arrest and prosecution of Mr. Yu is further demonstrated by

18  the rampant hypocrisy of LA County.  Despite Mr. Yu's arrest on October 4, 2022, and the

19  allegations against him and Konnech, LA County has continuously used Konnech's PollChief

20  software, including for the 2022 Midterm Election in November 2022 and other local elections in

21  2023, and sought and agreed to an amended contract—long after Defendants' misconduct directed

22  at Plaintiffs—to ensure a continued, long-term relationship with Konnech.  If LA County believed

23  that Defendants' accusations that led to Mr. Yu's arrest and prosecution and the search and seizure

24  of Plaintiffs' property had any merit, it would have terminated its contract with Konnech.  But LA

25  County has conducted two security audits pursuant to its contract with Konnech, and not only

26  continues to use Konnech for election logistics services, but knowingly and intentionally extended

27  its business relationship with Konnech to enable LA County to continue using Konnech's services

28  for the foreseeable future.

129.   Remarkably, nobody within the LA County DA's Office ever contacted the LA County Registrar's Office to question them about Konnech, or whether they had experienced any security concerns.  In fact, the LA County Registrar's Office, which works closely with Konnech on an almost daily basis, was wholly unaware of the investigation into Plaintiffs, and was shocked by the arrest and allegations.  And what is more, the LA County Registrar's Office confirmed that prosecutors have never provided evidence that Plaintiffs stored data overseas.[43]

**Defendants' Actions Have Destroyed Konnech's Business and Mr. Yu's Reputation**

130.   Because of Defendants' wrongful arrest and prosecution of Mr. Yu, Mr. Yu has suffered immense mental anguish and emotional distress.  As explained above, Mr. Yu was subjected to treatment typically reserved for violent criminals.  His front door was broken open with a battering ram, his wife was harassed, and his home and personal belongings were upended by overzealous law enforcement backed by a fraudulent warrant that lacked any probable cause.

131.   Mr. Yu's good name was then dragged through the mud by Defendant Gascón during a press conference and press release, along with the numerous articles written about him that incorrectly branded him a criminal.  Even after the criminal charges were dropped against Mr. Yu, he has since lived in fear that police could kick in his front door again to reassert charges against him after claiming that the investigation is still ongoing.

132.   And if that weren't enough, Mr. Yu, his family, and Konnech's employees became the subjects of repeated death threats, by e-mail and phone, which forced Mr. Yu and his family to flee their home and live in hotels to stay safe.  For example, on the day of Mr. Yu's arrest, Konnech received an email stating that, "[t]he citizens should drag you all in to the street & hang you for treason!"  And in the days following, Konnech and Mr. Yu received further threats and xenophobic and racist comments: "[Y]ou will be eliminated," "This Godless bastard needs to face the firing squad," "we're gonna hunt them down til the last one of them is either dead or locked up for good . . . we will not stop until we caught 'em all," and "FUCKING CHINESE COMMUNIST SON OF

---

[43] James Queally, Sarah D. Wire, *How did Gascón end up launching a criminal probe sparked by far-right election conspiracy theories?*, Los Angeles Times (Nov. 16, 2023), available at https://www.latimes.com/politics/story/2022-11-16/gascon-targeted-poll-worker-registration-company-at-heart-of-conspiracy-theories.

COMPLAINT

A BITCHES!!!!!!!! BELT&ROAD INITIATIVE SUKEE SUKEE!!!!!! KUNG FLU!!!!!!! BAT FLIED LICE!!!!!!! SUZI WONG!!!!!! CHARLIE CHAN!!!!!! FANG FANG!!!!!! FJB!!!!!! MAGA!!!!!!"  Dead animals have also been left lined up outside of Mr. Yu's home as another apparent threat.

133.    Konnech's offices have also been targeted by vandals, including people egging the office.  And even more frightening, someone began posting videos online of them roaming the halls of Konnech's office building while, fortunately, Konnech's employees were working from remote locations for safety amidst the death threats.  The distress suffered by Mr. Yu and his family as a result of Defendants' misconduct is simply unfathomable.

134.    Konnech has also lost numerous customers in the wake of Mr. Yu's wrongful arrest and Defendants' misconduct directed at Plaintiffs, resulting in a loss in excess of 60% of Konnech's income including, most recently, Lake County, who canceled its contract with Konnech after pushback from the community in the wake of Mr. Yu's wrongful arrest.  Though the Election Deniers started spreading far-right conspiracy theories about Konnech before Mr. Yu's arrest, Defendants' conduct lent credibility to those conspiracy theories and essentially rubberstamped them as true.  Specifically, Konnech had 36 customers prior to Mr. Yu's arrest.  However, after Mr. Yu's arrest and even after the dismissal of all charges against Mr. Yu, Konnech lost 14 customers that accounted for 60% of its income as a result of Defendants' actions.

**COMPLIANCE WITH CALIFORNIA GOVERNMENT CLAIMS ACT**

135.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 134, as if fully set forth herein.

136.    Prior to commencing this litigation, Plaintiffs presented timely tort claims to Defendant LA County pursuant to the California Government Claims Act and which were deposited in the mail on May 5, 2023 (the "Claim Notices").  In the Claim Notices, Plaintiffs set forth in substantial detail the multiple violations of state law that Defendants perpetrated on Plaintiffs, causing substantial and ongoing economic and noneconomic damages to Plaintiffs that continue to this day, as well as the specific facts that underlie Plaintiffs' claims.

137.   On or about May 17, 2023, Defendant LA County improperly rejected some unspecified portion of Plaintiffs' claims as untimely to the extent they "pertain[] to activities occurring from May 8, 2023 to November 7, 2022," because it alleges such claims were "not presented within six months after the event or occurrence as required by law."  As for "activities" that occurred on or after November 8, 2022, Defendant LA County considered claims based on such unspecified "activities" to be timely but subsequently rejected them via letter on or about July 3, 2023.

138.   With regard to the unspecified claims that "pertain[] to activities occurring from May 8, 2023 to November 7, 2022,"[44] Plaintiffs corrected Defendant LA County's misunderstanding of California law concerning the timeliness of their claims and, out of an abundance of caution, also submitted an Application to Present Claims Not Timely Filed (the "Application") on May 30, 2023.  That Application noted that Defendant LA County incorrectly assessed the date of accrual for all of Plaintiffs' causes of action, and asserted that all of Plaintiffs' claim were timely presented.  More specifically, the Application explicitly noted that, under California law, the timeliness of Plaintiffs' claims is not measured by the date of any specific "activities," but instead by the date on which any asserted cause of action accrued under the applicable statute of limitations.  This is particularly true where, as is the case here, there exists no single injury-causing event from which the statutory time period can be measured, as Plaintiffs continue to suffer damages as a result of a continuing series of acts perpetrated by Defendants that continue to this date.

139.   Moreover, and as fully explained in the Application, to the extent any particular cause of action accrued prior to November 5, 2022—the beginning of the statutory period for claim presentation based on Plaintiffs' May 5, 2023 presentation date—Defendants' extensive efforts to

---

[44] Defendant LA County's May 17, 2023 letter improperly contended that Plaintiffs' claims were presented on May 8, 2023, and thus determined that claims would be untimely to the extent they "pertain" to activities occurring before November 8, 2022.  There can be no question, however, that Plaintiff presented their Claim Notices on May 5, 2023 and sent them via both certified mail and Federal Express on that date.  Pursuant to CAL. GOV. CODE § 915(f) a claim is deemed presented once mailed.  As a result, and despite Defendant LA County's contentions regarding an alleged November 8, 2022, trigger date for claims presentation, the claims presentation period actually began on November 5, 2023.

COMPLAINT

conceal the Election Deniers' involvement in, and the improper motives for, Defendants' unlawful arrest, search, seizure, detention and malicious prosecution of Plaintiffs prior to the November 9, 2022, dismissal of charges against Mr. Yu actively prevented Plaintiffs from discovering the accrual of any such cause of action.  Consequently, Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the nature of Defendants' wrongdoing and the resulting accrual of any causes of action against Defendants prior to November 9, 2022, and thus the discovery rule postponed the accrual of Plaintiffs' causes of action until at least that date or later.

140.    Because Defendant LA County's response letter contained no analysis of the causes of action presented in the Claim Notices or the dates on which those causes of action accrued, Defendant LA County's rejection of any of Plaintiffs' claims based on their timeliness was improper.  Consequently, Plaintiffs have complied with the claim presentation requirements of the California Government Claims Act for all claims presented, including the unspecified portion of Plaintiffs' claims that Defendant LA County purportedly and incorrectly found to be untimely.

141.    Alternatively, in the Application, Plaintiffs also sought leave to submit any claims that Defendant LA County failed to specify and incorrectly deemed to be untimely pursuant to CAL. GOV. CODE §§ 911.4 and 911.6, and established all requisite elements of same.  Plaintiffs' Application was filed less than two weeks after Plaintiffs received notice of Defendant LA County's finding that certain unspecified claims were untimely, and approximately seven months after the earliest possible accrual date of any of Plaintiffs' claims, and thus well within the one-year deadline for filing such applications as set forth in CAL. GOV. CODE § 911.4(b).

142.    Plaintiffs' Application and supporting exhibits established that the underlying facts of this case do not involve a solitary injury-causing event that would provide a single starting point for measuring statutory time frames for claim presentation, and instead involve a series of threatening, intimidating and coercive acts by members of the LA County DA's Office to weaponize unsubstantiated and frivolous conspiracy theories as part of a politically motivated investigation, arrest, search, seizure, detention and malicious prosecution in violation of Plaintiffs' constitutional and statutory rights.  The difficulty in establishing precisely when the clock started

-- 54 --

COMPLAINT

running for the presentment of various tort claims was then further compounded by Defendants' efforts throughout the relevant statutory time period to conceal from Plaintiffs—and the public at large—the improper biases underlying Defendants' actions, a key fact that underlies all of Plaintiffs' causes of action.

143.    More specifically, and as set forth in Plaintiffs' Application, Defendants intentionally and repeatedly concealed the substantial connections between the Election Deniers and those responsible for investigating Plaintiffs, including Defendants Stevens and Neff and consultants Haury and Cain of Cain & Associates, particularly including the fact that Defendants' actions were entirely based on baseless conspiracy theories propounded by the Election Deniers who have been repeatedly discredited.  For example, in October 2022, a spokesperson for the LA County DA's Office told a reporter that their office had not received any information on the case from the Election Deniers.[45]  Defendants also sealed the indictment and grand jury testimony that led to the unlawful arrest, search, seizure and detention, and that indictment and grand jury testimony remain sealed to this day, presumably because the indictment is based entirely on allegations made by the Election Deniers that Defendants knew were unreliable, not credible and untrustworthy.  Even after Defendants abandoned that sealed indictment in favor of a criminal complaint signed by Defendants Stevens and Neff, Plaintiffs did not learn of the substantial connections between Defendants and the Election Deniers until on or about November 9, 2022, when the LA County DA's Office released a statement explicitly noting that it was "concerned about both the pace of the investigation and the potential bias in the presentation of the evidence."

144.    In the weeks and months following that date—and despite earlier media statements by an LA County DA's Office spokesperson to the contrary—Plaintiffs learned through news media reports that Defendants recanted their previous statements and admitted that their investigation was originally based on a tip from the Election Deniers, and that Defendant Neff was reportedly placed on administrative leave as a result of his role in the investigation.  Plaintiffs

---

[45] See Natalia Contreas, *Federal judge demands True the Vote identify who provided access to poll worker data*, VoteBeat Texas (Oct. 7, 2022), available at https://texas.votebeat.org/2022/10/7/23393718/true-the-vote-konnech-lawsuit-data-china.

COMPLAINT

1   further learned in or about February 2023 in an affidavit filed by the Election Deniers in the Houston

2   Lawsuit, and then in discovery in that suit, that two other known associates of the Election

3   Deniers—consultants Haury and Cain of Cain & Associates—had been retained by the LA County

4   DA's Office as consultants to participate in Defendants' unlawful search and seizure of Mr. Yu's

5   home and Konnech's business offices, that Haury still possessed some of Plaintiffs' property that

6   Defendants had seized, and that Haury was a speaker at The Pit event. And Plaintiffs did not learn

7   until September 11, 2023, that Haury actually testified as a fact witness before the grand jury, and

8   that Haury and Cain & Associates were not hired as so-called forensics experts for Defendants until

9   *after* that testimony and upon Haury's own recommendation.

10         145.   Defendants' efforts to conceal their alignment with and reliance on the Election

11   Deniers for their unlawful arrest, search, seizure and detention—which Plaintiffs did not begin to

12   grasp until November 9, 2022, at the earliest, and did not truly understand until much later—made

13   it impossible for Plaintiffs to ascertain any earlier than November 9, 2022, that they had any

14   potential causes of action against Defendants.[46] Indeed, as previously explained, Plaintiffs did not

15   discover, and could not have reasonably discovered through the exercise of reasonable diligence,

16   the nature of Defendants' wrongdoing prior to November 9, 2022, and thus the discovery rule

17   postponed the accrual of Plaintiffs' causes of action until at least that date or later. For all of these

18   reasons, and as a result of their own diligent investigation throughout the statutory time period,

19   Plaintiffs reasonably believed that the November 9, 2022, dismissal of criminal charges against Mr.

20   Yu, along with the concurrent release of statements and news stories highlighting the abnormal

21   nature of Defendants' actions, constituted the trigger date for the six-month claim presentation

22   period under CAL. GOV. CODE § 911.2, and did in fact present their claims to Defendant LA County

23   within six months of that date. As more fully explained in the Application, Plaintiffs thus contend

24   that the highly unusual and complicated facts and circumstances that underlie their claims

25   demonstrate that Plaintiffs' alleged failure to timely present these claims was the result of mistake,

26   inadvertence, surprise or excusable neglect, and Plaintiffs acted in the same way a reasonably

27

28

---

[46] Importantly, Defendant LA County conceded in response to Plaintiffs' initial claim presentation that claims pertaining to activities occurring since November 8, 2022, were considered timely.

COMPLAINT

prudent person would under similar circumstances.  *See* CAL. GOV. CODE § 946.6(b).  Moreover, Defendants would not be prejudiced by the relief sought in the Application due to, among other reasons, the prompt presentation of the Application—which was presented less than two weeks after Plaintiffs received notice of Defendant LA County's finding that certain unspecified claims were allegedly untimely—and Defendants' repeated claims that it is still reviewing the data that was improperly seized from Plaintiffs when it arrested Mr. Yu and executed the search warrants.

146.    Defendant LA County never responded to Plaintiffs' Application, which was thus deemed rejected by operation of law on or about July 14, 2023.

147.    Plaintiffs are concurrently filing a separate Petition for Relief from Government Claims Act Claim Presentation Requirement pursuant to CAL. GOV. CODE § 946.6 which seeks an order relieving Plaintiffs of any obligation under CAL. GOV. CODE § 945.4 to timely present whatever unspecified portion of Plaintiffs' claims that Defendant LA County impliedly rejected by operation of law.

**CAUSES OF ACTION**

**COUNT ONE**

**Violation of the Tom Bane Civil Rights Act, California Civil Code § 52.1 *et seq.***

**(Against All Defendants)**

148.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 147, as if fully set forth herein.

149.    Plaintiffs had firmly established rights to be free from unreasonable search and seizure, to be free from unreasonable seizure of a person, to be free from false arrest and false imprisonment, and to be free from malicious prosecution, all without probable cause, under the Fourth Amendment and/or Fourteenth Amendment to the United States Constitution and Article I, Sections 7 and 13 of the California Constitution.

150.    Defendants, acting individually, jointly and/or in conspiracy with others, intentionally interfered with Plaintiffs' enjoyment of their rights to be free from unreasonable search and seizure, unreasonable seizure of a person, false arrest, false imprisonment and malicious

prosecution, all without probable cause, through the use of threats, intimidation and coercion, including, without limitation, the following:

- Subjecting Plaintiffs to an improper and unlawful arrest, search and seizure, detention and the malicious prosecution of frivolous criminal charges based on unsubstantiated and baseless conspiracy theories concocted by the Election Deniers with full knowledge of the falsity of those conspiracy theories and the Election Deniers' well-known history of making thoroughly debunked claims about election malfeasance or, alternatively, with reckless disregard for the truth of said conspiracy theories;

- Raiding Mr. Yu's home without probable cause and with excessive force, with weapons drawn, using a battering ram to force their way into Mr. Yu's home despite having Mr. Yu in custody, keys to Mr. Yu's home and his complete lack of any criminal history and the non-violent nature of the frivolous criminal charges ultimately asserted against Mr. Yu, which effectively amounted to nothing more than an alleged breach of contract (something that is not, in fact, a criminal offense);

- Confiscating phones during their illegal search and seizure to prevent Mr. Yu's wife from reaching out to an attorney;

- Refusing to present a search warrant to Mr. Yu's wife or to disclose where Mr. Yu would be detained and refusing to permit Mr. Yu to make a phone call to reach his attorney, which served to prevent Mr. Yu's wife and attorney from locating Mr. Yu until the middle of the night, more than 15 hours after his unlawful arrest;

- Intimidating Konnech's employees during the unlawful search and seizure at Konnech's business office and subjecting them to interrogation without counsel present, confiscating all of Plaintiffs' computer equipment, hard drives and servers—which included privileged email communications between Plaintiffs and their legal counsel that to this date have yet to be returned—which interfered with Plaintiff's performance under contracts with various governmental entities in the 2022 Midterm Election that was then mere weeks away;

- Requiring Mr. Yu to undergo unnecessary and costly bail hearings in both Michigan and California, an unnecessary and costly  extradition proceedings in Michigan, and unreasonably rejecting Mr. Yu's offer to voluntarily travel to Los Angeles for his arraignment;

- Attempting to shackle and "perp-walk" Mr. Yu through the courtroom even though Mr. Yu had, by that time, been voluntarily sitting in the LA County courtroom for two days awaiting his arraignment;

COMPLAINT

- Unlawfully detaining Mr. Yu in California for a period of approximately 37 days while Defendants unsuccessfully sought to deny him bail;

- Seeking unjustifiable bail restrictions in yet another bail hearing in LA County after Mr. Yu prevailed in Michigan and voluntarily traveled to Los Angeles for his arraignment, all despite Mr. Yu's lack of any criminal history and the fact that he had already surrendered his passport, which ultimately resulted in Mr. Yu being held in Los Angeles under house arrest at a Los Angeles hotel—more than 2,200 miles from his home and Konnech's office in Michigan—while wearing two different ankle monitors (one for Michigan and one for California), and also prohibited Mr. Yu from communicating with any Konnech employees during the weeks leading up to the 2022 Midterm Election leading to a failure to fulfill election-related contracts and a resulting crippling loss of revenue; and

- Refusing to drop the frivolous criminal charges against Mr. Yu until November 9, 2022—one day after the 2022 Midterm Election—once the transparently political stunt no longer served any meaningful purpose in terms of maximizing the Election Deniers' fundraising efforts, and after Defendants had already garnered the press they sought.

151.    While Defendants purportedly acted pursuant to a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, including, without limitation:

- Intentionally and maliciously relying on, and/or acting with reckless disregard for the truth of, the fabricated nature of the Election Deniers' claims that formed the entire basis for Defendants' investigation;

- Acting with knowledge that the Election Deniers were publicly known to be discredited conspiracy theorists who were not reliable, credible, suitable or trustworthy;

- Acting with knowledge that the Election Deniers were being investigated by the Arizona Attorney General's Office in connection with false claims of election fraud, and that repeated failures to provide any evidence of alleged voter fraud led the Arizona Attorney General's Office to call for a federal investigation into the Election Deniers and their status as a nonprofit organization;

- Acting with knowledge that the Election Deniers had presented these same frivolous claims about Plaintiffs' supposed election malfeasance to the FBI and other law enforcement agencies that chose not to pursue any charges against Plaintiffs, and that the FBI had investigated the Election Deniers' accusations concerning Plaintiffs for 15 months and instead had chosen to open an investigation into the Election Deniers for computer hacking and theft of the personal identifying information of U.S. poll workers;

- Acting with knowledge that the Election Deniers were the subject of a pending voter intimidation lawsuit in Georgia, filed in December 2020, in which they are alleged to have improperly challenged 364,000 voter registrations—"particularly Black and brown voters and first-time voters"—based on unreliable records of mailing address changes which, in and of themselves, are insufficient to challenge voter eligibility;

- Acting with knowledge that Defendant Stevens had personally attended The Pit event held by the Election Deniers, which was advertised as an event where the Election Deniers would supposedly reveal "devastating information" to definitively prove that the 2020 U.S. Presidential election was stolen, but was instead used to publicize fabricated conspiracy theories about Plaintiffs;

- Acting with knowledge that Defendant Neff had personally reached out to the Election Deniers, despite the fact that other baseless conspiracies concocted by the Election Deniers had already been publicly challenged in courts and by the Arizona Attorney General's Office;

- Retaining consultants Cain and Haury of Cain & Associates and having them participate in the raids on Mr. Yu's home and Konnech's business offices even though Cain and Haury are known to be close associates of the Election Deniers, with Haury appearing on stage as a speaker at The Pit event (which was attended by Defendant Stevens) during which he demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," and even though Haury previously testified as a fact witness before the grand jury and Defendants had at their disposal the fourth largest law enforcement agency in the county with over 300 employees, including their own forensic computer experts;

- Intentionally concealing the close ties that Defendants Stevens and Neff, as well as consultants Cain and Haury of Cain & Associates, had with the Election Deniers and their attempts to fabricate and monetize baseless conspiracy theories about election fraud generally—and about Plaintiffs specifically—to obscure the political bias and lack of any true investigation before obtaining warrants despite the lack of any probable cause; and

- Seizing information and data that pre-dated Konnech's contractual relationship with LA County and thus could bear no relevance whatsoever to any criminal charges asserted against Mr. Yu or the search or seizure of Plaintiffs' property.

152.    Defendants knew or should have known that the Election Deniers and the information they provided was unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause.  Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal

identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

153.    Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth.   Based on the totality of the circumstances, no reasonably prudent person could have concluded that probable cause existed based on the information provided.  This is only further evidenced by the fact that, on information and belief, Defendant Neff was subsequently placed on administrative leave and the criminal charges were voluntarily dismissed as a result of potential bias in Defendants' presentation and investigation of the evidence.

154.    The manner in which Defendants executed the unreasonable search and seizure, seizure of a person, false arrest, false imprisonment and malicious prosecution, all without probable cause and using excessive force, constitutes operational decisions that are incident to Defendants' normal functions and the ministerial implementation of basic policy.

155.    Defendants perpetrated this intentional and reckless interference of Plaintiffs' Constitutional rights in violation of California Civil Code § 52.1.

156.    Defendant LA County is liable through respondeat superior pursuant to common law and California Government Code § 815.2 and/or is vicariously liable for the negligence of its employees, investigators, consultants and agents within the course and scope of their employment, consultancy or agency as alleged herein.  At all times material to this cause of action, Defendants Gascón, Neff, Stevens, Cain & Associates and consultants, Haury and Cain, and any investigators were acting in the course and scope of their employment, consultancy or agency with Defendant LA County.

157.    Defendants, acting in concert with one another and with other known and unknown co-conspirators including, without limitation, the Election Deniers, Cain & Associates, Cain, Haury and law enforcement personnel in Michigan, reached an agreement amongst themselves to violate

Plaintiffs' constitutional and state law rights in connection with Count One and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed amongst themselves to protect one another from liability for these violations of Plaintiffs' rights in connection with Count One. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity, and each co-conspirator was acting as individuals for their individual advantage in furtherance of political, racial and xenophobic beliefs. The violations of law described herein were accomplished by Defendants' conspiracy. The misconduct described herein was objectively unreasonable, was undertaken intentionally, in total disregard of the truth regarding the baseless conspiracy theories that served as the foundation of Defendants' investigation of Plaintiffs and all subsequent acts, and with willful indifference to Plaintiffs' constitutional and state law rights in connection with Count One.

158.   As a direct and foreseeable result of Defendants' actions, Plaintiffs suffered extensive economic and non-economic damages, including, without limitation, lost profits, lost wages, lost business opportunities, mental anguish, emotional distress, humiliation and embarrassment.

159.   Defendants' conduct constitutes oppression, fraud or malice within the meaning of California Civil Code § 3294 and punitive and exemplary damages should be assessed against Defendants.

## COUNT TWO

### Violation of Ralph Civil Rights Act, California Civil Code § 51.7

### (Against All Defendants)

160.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 159, as if fully set forth herein.

161.   Defendants, acting individually, jointly and/or in conspiracy with others, committed or threatened violent acts against Plaintiffs and/or their property for political, racist and xenophobic reasons. Defendants' unlawful search and seizure, unreasonable seizure of a person, false arrest and false imprisonment, all without probable cause, were motivated by Mr. Yu's race, ancestry,

national origin, citizenship or immigration status, and the Election Deniers' baseless allegations regarding Plaintiffs' supposed connections to the Chinese Communist Party. Moreover, Defendants retained consultants Haury and Cain of Cain & Associates to participate in the raid on Plaintiffs' home and business offices with full knowledge that Haury had previously appeared on stage as a speaker at The Pit event (which was attended by Defendant Stevens) during which Haury explicitly demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk." The violent acts threatened or committed against Plaintiffs include:

- Raiding Mr. Yu's home without probable cause and with excessive force, with weapons drawn, using a battering ram to force their way into Mr. Yu's home despite having Mr. Yu in custody and keys to Mr. Yu's home and his complete lack of any criminal history and the non-violent nature of the frivolous criminal charges ultimately asserted against Mr. Yu, which effectively amounted to nothing more than an alleged breach of contract (something that is not, in fact, a criminal offense);

- Intimidating Konnech's employees during the unlawful search and seizure at Konnech's business office and subjecting them to interrogation without counsel present, confiscating all of Plaintiffs' computer equipment, hard drives and servers—which included privileged email communications between Plaintiffs and their legal counsel that to this date have yet to be returned—which interfered with Plaintiff's performance under contracts with various governmental entities in the 2022 Midterm Election that was then mere weeks away;

- Attempting to shackle and "perp-walk" Mr. Yu through the courtroom even though Mr. Yu had, by that time, been voluntarily sitting in the LA County courtroom for two days awaiting his arraignment; and

- Unlawfully detaining Mr. Yu for a period of approximately 37 days despite Mr. Yu's lack of any criminal history and the fact that he had already surrendered his passport, by holding Mr. Yu in Los Angeles under house arrest at a Los Angeles hotel—more than 2,200 miles from his home and Konnech's office in Michigan—while wearing two different ankle monitors (one for Michigan and one for California), and also prohibiting Mr. Yu from communicating with any Konnech employees during the weeks leading up to the 2022 Midterm Election leading to a failure to fulfill election-related contracts and a resulting crippling loss of revenue.

162.   In performing the acts and/or omissions as alleged herein, Defendants, acting individually, jointly and/or in conspiracy with others, caused Plaintiffs to be subjected to violence

or intimidation by threat of violence as a result of Mr. Yu's race, ancestry, national origin, citizenship or immigration status, and the Election Deniers' baseless allegations regarding Plaintiffs' supposed connections to the Chinese Communist Party.

163.     As a result, Plaintiffs are entitled to relief under California Civil Code § 51.7, including, without limitation, to compensatory damages, statutory damages, punitive damages, attorneys' fees and costs in amounts to be determined according to proof.

164.     While Defendants purportedly acted pursuant to a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, and further acted unreasonably under the circumstances. Defendants had reason to doubt the truthfulness and reliability of this information, and knew or should have known that the Election Deniers and the information they provided was unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause. Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

165.     Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth.  Based on the totality of the circumstances, no reasonably prudent person could have concluded that probable cause existed based on the information provided.  This is only further evidenced by the fact that, on information and belief, Defendant Neff was subsequently placed on administrative leave and the criminal charges were voluntarily dismissed as a result of potential bias in the presentation of evidence during Defendants' investigation.

166.     Defendants' conduct complained of herein constitutes operational decisions that are incident to Defendants' normal functions and the ministerial implementation of basic policy.

COMPLAINT

167.    Defendants Gascon's, Neff's, and Stevens', and Cain & Associates' and consultants Cain's and Haury's, acts or omissions as alleged herein were performed within the course and scope of their employment, consultancy or agency with Defendant LA County.  Defendant LA County is thus liable through respondeat superior pursuant to common law and CAL. GOV. CODE § 815.2 and/or is vicariously liable for the acts of its employees, investigators, consultants and agents within the course and scope of their employment, consultancy or agency as alleged herein.  At all times material to this cause of action, Defendants Gascón, Neff and Stevens, Cain & Associates and consultants Cain and Haury, and any investigators were acting in the course and scope of their employment, consultancy or agency with Defendant LA County.

168.    Defendants, acting in concert with one another and with other known and unknown co-conspirators including, without limitation, the Election Deniers, Cain & Associates, Cain, Haury and law enforcement personnel in Michigan, reached an agreement amongst themselves to violate Plaintiffs' state law rights  in connection with Count Two and conspired by concerted action to accomplish an unlawful purpose by unlawful means.  In addition, these co-conspirators agreed amongst themselves to protect one another from liability for these violations of Plaintiffs' rights in connection with Count Two.  In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity, and each co-conspirator was acting as individuals for their individual advantage in furtherance of political, racial and xenophobic beliefs.  The violations of law described herein were accomplished by Defendants' conspiracy.  The misconduct described herein was objectively unreasonable, was undertaken intentionally, in total disregard of the truth regarding the baseless conspiracy theories that served as the foundation of Defendants' investigation of Plaintiffs and all subsequent acts, and with willful indifference to Plaintiffs' state law rights in connection with Count Two.

169.    As a direct and foreseeable result of Defendants' actions, Plaintiffs suffered extensive economic and non-economic damages, including, without limitation, lost profits, lost wages, lost business opportunities, mental anguish, emotional distress, humiliation and embarrassment.

COMPLAINT

170.    Defendant LA County's conduct constitutes oppression, fraud or malice within the meaning of California Civil Code § 3294 and punitive and exemplary damages should be assessed against Defendant LA County.

## COUNT THREE

### 42 U.S.C. § 1983 – Violation of Fourth and Fourteenth Amendments

### (Against Defendants Gascón, Neff and Stevens)

171.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 170, as if fully set forth herein.

172.    Defendants, acting individually, jointly and/or in conspiracy with others, subjected Mr. Yu to an unlawful and unreasonable search and seizure, unlawful seizure of a person, false arrest and false imprisonment, all without probable cause, based entirely on unsubstantiated and frivolous conspiracy theories concocted by the Election Deniers, with whom Defendants knowingly aligned themselves, in order to destroy Plaintiffs' reputations and cripple their business operations as part of continued efforts to profit from patently false and thoroughly debunked claims that the 2020 U.S. Presidential election was stolen from former President Trump.

173.    Defendants further subjected Konnech to the same unlawful and unreasonable search and seizure, again without probable cause, and based on the same unsubstantiated and frivolous conspiracy theories concocted by the Election Deniers, with whom Defendants knowingly aligned themselves, for the same purposes.

174.    Mr. Yu was unlawfully detained without probable cause for a period of approximately 37 days while Defendants unsuccessfully sought to prevent bail.  While Mr. Yu offered to voluntarily appear in Los Angeles for his arraignment, Defendants unreasonably rejected this offer and subjected Mr. Yu to an unnecessary and costly bail hearing and extradition proceeding in Michigan.  After Mr. Yu prevailed in Michigan and voluntarily traveled to Los Angeles for his arraignment, Defendants once again subjected Mr. Yu to yet another bail hearing in LA County, and incredibly attempted to shackle and "perp-walk" Mr. Yu through the courtroom even though by that point he had been voluntarily sitting in the LA County courtroom for two days awaiting his arraignment.  Defendants then argued that Mr. Yu—who has no criminal history whatsoever—

should be denied bail due to his supposed connections to China even though Mr. Yu had already surrendered his passport.

175.   Over Defendants' objections, an LA County judge granted Mr. Yu bail, but based on Defendants' frivolous charges and false representations, the court held Mr. Yu under house arrest at a Los Angeles hotel and did not permit Mr. Yu to leave the confines of that hotel other than to meet with his legal counsel.  Mr. Yu was further restricted from communicating with anyone at Konnech despite the fact that Defendants' baseless allegations and frivolous criminal charges had thrown Konnech's entire business into turmoil mere weeks before the 2022 Midterm Election.

176.   Defendants deprived Mr. Yu of his freedom of movement as part of a series of threats, intimidation and coercion designed to maximize publicity for a transparently political arrest, search, seizure and criminal prosecution.  Mr. Yu's arrest, seizure and detention was thus unreasonable, unnecessarily prolonged, and degrading and involved undue invasion of privacy. Mr. Yu did not consent to being confined.

177.   In service of their illicit objectives, and in addition to the unlawful search and seizure, seizure of a person, false arrest and false imprisonment, Defendants engaged in misconduct in the investigation that led to the unlawful search, seizure, arrest and detention, including:

- Defendants' malicious and/or reckless disregard for the fabricated nature of the Election Deniers' claims that formed the entire basis for Defendants' investigation;

- Acting with knowledge that the Election Deniers were publicly known to be discredited conspiracy theorists who were not reliable, credible, suitable or trustworthy;

- Acting with knowledge that the Election Deniers were being investigated by the Arizona Attorney General's Office in connection with false claims of election fraud, and that repeated failures to provide any evidence of alleged voter fraud led the Arizona Attorney General's Office to call for a federal investigation into the Election Deniers and their status as a nonprofit organization;

- Acting with knowledge that the Election Deniers had presented these same frivolous claims about Plaintiffs' supposed election malfeasance to the FBI and other law enforcement agencies that chose not to pursue any charges against Plaintiffs, and that the FBI had investigated the Election Deniers' accusations concerning Plaintiffs for 15 months and instead had chosen to

open an investigation into the Election Deniers for computer hacking and theft of the personal identifying information of U.S. poll workers;

- Acting with knowledge that the Election Deniers were the subject of a pending voter intimidation lawsuit in Georgia, filed in December 2020, in which they are alleged to have improperly challenged 364,000 voter registrations—"particularly Black and brown voters and first-time voters"—based on unreliable records of mailing address changes which, in and of themselves, are insufficient to challenge voter eligibility;

- Acting with knowledge that Defendant Stevens had personally attended The Pit event held by the Election Deniers, which was advertised as an event where the Election Deniers would supposedly reveal "devastating information" to definitively prove that the 2020 U.S. Presidential election was stolen, but was instead used to publicize fabricated conspiracy theories about Plaintiffs;

- Acting with knowledge that Defendant Neff had personally reached out to the Election Deniers, despite the fact that other baseless conspiracies concocted by the Election Deniers had already been publicly challenged in courts and by the Arizona Attorney General's Office;

- Retaining consultants Cain and Haury of Cain & Associates and having them participate in the raids on Mr. Yu's home and Konnech's business offices even though Cain and Haury are known to be close associates of the Election Deniers, with Haury appearing on stage as a speaker at The Pit event (which was attended by Defendant Stevens) during which he demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," even though Haury previously testified as a fact witness before the grand jury, and both Haury and Cain have previously and publicly solicited donations for the Election Deniers as part of supposed political "fundraising" efforts that were instead diverted by the Election Deniers for their own financial benefit;

- Intentionally concealing the close ties that Defendants Stevens and Neff, as well as consultants Cain and Haury, had with the Election Deniers and their attempts to fabricate and monetize baseless conspiracy theories about election fraud generally—and about Plaintiffs specifically—to obscure the political bias and lack of any true investigation before obtaining warrants despite the lack of any probable cause; and

- Replacing the original, sealed indictment with an unsealed criminal complaint that was signed and certified by both Defendant Stevens, who had attended the Election Deniers' Pit event, and Defendant Neff, who admittedly relied on the Election Deniers as part of his "investigation."

178.   While Defendants purportedly acted pursuant to a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, and further acted unreasonably under the circumstances when executing the warrant.  Defendants had reason to doubt the truthfulness and reliability of this information, and knew or should have known that the Election Deniers and the information they provided were unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause.  Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

179.   Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth.  Based on the totality of the circumstances, no reasonably prudent person could have concluded that probable cause existed based on the information provided.  This is only further evidenced by the fact that, on information and belief, Defendant Neff was subsequently placed on administrative leave and the criminal charges were voluntarily dismissed as a result of potential bias in the presentation of evidence during Defendants' investigation.

180.   Ignoring the unreliable, not credible and untrustworthy source of information and the fact that Plaintiffs' rights under the U.S. Constitution and California Constitution and the Michigan Constitution had been violated without any evidence or probable cause, Defendant Gascón made public statements to the media about Plaintiffs, maliciously or recklessly touting the frivolous charges brought by the LA County DA's Office.  Defendant Gascón publicly claimed that the charges were based on a supposed data breach that constituted "an ongoing threat to our digital way of life," even though the criminal complaint upon which the frivolous criminal charges were ultimately based did not allege a data breach of any kind.  He further publicly and falsely claimed

1  that Plaintiffs had failed to properly maintain LA County confidential data, including personal

2  identifying information, with which they had been entrusted.

3      181.  Ironically, even as he made these allegations, Defendant Gascón's office had already

4  retained consultants Haury and Cain—Haury, a known racist and xenophobe, and both known

5  associates of the Election Deniers who initially concocted the baseless conspiracy theories about

6  Plaintiffs—without requiring them to sign a confidentiality agreement of any kind, and then

7  provided them access to Plaintiffs' confidential business data, which included LA County's poll

8  worker data as well as privileged communications between Plaintiffs and their attorneys, and

9  further took no action to retrieve this data even after the Election Deniers threatened to publicly

10  disclose the data.  Defendant Gascón further publicly thanked the LA County DA's Office's

11  employees, investigators and consultants who unlawfully conducted the arrest, search and seizure

12  without probable cause "for their commitment to eliminating cyber intrusions against government

13  entities and local businesses."  Defendants' conduct created a highly prejudicial and inflamed

14  atmosphere that seriously impaired the fairness of the judicial proceedings against Mr. Yu and

15  caused him to suffer loss of freedom, mental anguish and humiliation.

16      182.  When a spokesperson for the LA County DA's Office was questioned about the

17  Election Deniers' involvement, they initially said they were unaware of the Election Deniers'

18  involvement and that the Election Deniers had no input on Defendant LA County's investigation.

19  However, after the frivolous criminal charges against Mr. Yu had been voluntarily dropped, online

20  media reports indicated that the LA County DA's Office acknowledged that the investigation into

21  Plaintiffs was based on a tip from the Election Deniers.  Moreover, a spokesperson for Defendant

22  LA County further confirmed that, during the course of the investigation into Plaintiffs, "upper-

23  level management became aware of irregularities in how the case was presented," and further

24  expressed concern "about both the pace of the investigation and the potential bias in the presentation

25  and investigation of the evidence."  On information and belief, Defendant Neff was placed on

26  administrative leave due to his role in the reckless and malicious investigation.

27      183.  Defendants' conduct violated Plaintiffs' rights to be free from unreasonable

28  searches and seizures, unlawful seizures of a person, false arrest and false imprisonment under the

Fourth and Fourteenth Amendments to the United States Constitution, as well as under the California Constitution and Michigan Constitution.

184.    The conduct complained of herein was performed in Defendants' capacity as investigators performing investigative functions attempting to support a finding of probable cause, and further was performed in the complete absence of probable cause.

185.    Defendants' conduct violated Plaintiffs' statutory and/or constitutional rights that were clearly established at the time of Defendants' conduct, and reasonably prudent persons would have understood that Defendants' conduct would violate Plaintiffs' statutory and/or constitutional rights.

186.    Defendants, acting in concert with one another and with other known and unknown co-conspirators including, without limitation, the Election Deniers, Cain & Associates, Cain, Haury and law enforcement personnel in Michigan, reached an agreement amongst themselves to violate Plaintiffs' constitutional rights in connection with Count Three and conspired by concerted action to accomplish an unlawful purpose by unlawful means.  In addition, these co-conspirators agreed amongst themselves to protect one another from liability for these violations of Plaintiffs' rights in connection with Count Three.  In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity, and each co-conspirator was acting as individuals for their individual advantage in furtherance of political, racial and xenophobic beliefs.  The violations of law described herein were accomplished by Defendants' conspiracy.  The misconduct described herein was objectively unreasonable, was undertaken intentionally, in total disregard of the truth regarding the baseless conspiracy theories that served as the foundation of Defendants' investigation of Plaintiffs and all subsequent acts, and with willful indifference to Plaintiffs' constitutional rights in connection with Count Three.

187.    As a proximate result of Defendants' wrongful acts, Plaintiffs have sustained, and will in the future sustain, physical and pecuniary injury and other compensable injuries.

188.    As a further proximate result of Defendants' wrongful acts, Plaintiffs suffered general damages including pain and suffering, mental anguish, and emotional distress.

COMPLAINT

189.     Each and all Defendants acted recklessly and with callous disregard for Plaintiffs' constitutional rights.  The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious such that Plaintiffs are entitled to punitive and exemplary damages.

## COUNT FOUR

### 42 U.S.C. § 1983 – *Monell* Liability: Policy, Practice or Custom

### (Against Defendant LA County)

190.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 189, as if fully set forth herein.

191.     Defendant LA County promulgated and maintained an unconstitutional policy, practice or custom which caused the LA County DA's Office's employees, investigators and consultants to unlawfully arrest, search, seize and criminally prosecute citizens for transparently political, racist and xenophobic reasons, particularly with regard to citizens of Asian ancestry living, traveling and/or working in or with Los Angeles County as well as businesses owned by citizens of Asian ancestry.  The LA County DA's Office's employees, investigators and consultants were also authorized or permitted to prepare and fabricate evidence and to subject such persons to politically biased arrests, searches, seizures and detentions without probable cause.

192.     Defendant LA County, as a matter of custom, practice and policy, repeatedly and tacitly permitted and ratified instances wherein the LA County DA's Office's employees, investigators and consultants deliberately deprived citizens of state law and Constitutional protections against malicious prosecution and unlawful search and seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution based on blatantly political, racist and xenophobic motivations as a result of said citizens' race, color and/or national origin.

193.     Defendant LA County, as a matter of custom, practice and policy, also failed to maintain adequate and proper training for the LA County DA's Office's employees, investigators and consultants necessary to educate said employees, investigators and consultants as to the constitutional rights of citizens to be free from such politically motivated wrongful acts, to prevent consistent and systematic denial of Constitutional rights for blatantly political motives, and to prevent politically biased malicious prosecutions and unlawful searches and seizures.

194.    Defendant LA County knew or should have known, based on investigation documents, arrest reports, departmental reports, claims for damages and lawsuits, that the inadequate training and supervision was likely to result in a deprivation of the right of citizens to be free from unreasonable searches, seizures and malicious prosecutions.

195.    Defendants Gascón, Neff and Stevens, as well as Cain & Associates and consultants Cain and Haury, in their capacity as LA County DA's Office employees, investigators and consultants, violated Plaintiffs' right to be free from unreasonable searches, seizures and malicious prosecutions.

196.    Defendant LA County was deliberately indifferent to the widespread misconduct on the part of LA County DA's Office employees, investigators and consultants in engaging in unlawful searches, seizures and malicious prosecutions for transparently political, racist and/or xenophobic reasons.

197.    Defendant LA County's failure to provide adequate training and supervision was the direct and foreseeable cause of the deprivation of Plaintiffs' rights to be free from unreasonable searches, seizures and malicious prosecutions.

198.    The abuses in question were the product of a culture of tolerance within the LA County DA's Office.  This culture is rooted in the deliberate indifference of high-ranking LA County officials, including without limitation Defendants Gascón, Stevens and Neff and any other high ranking official, individually or acting in concert with one another, to the widespread misconduct on the part of the LA County DA's Office's employees, investigators and consultants in recklessly engaging in unlawful arrests, searches, seizures and criminal prosecutions.

199.    The violation of Plaintiffs' Constitutional rights was the result of Defendants' customs, policies or practices which resulted in the targeting of persons of Asian ancestry, such as Mr. Yu, and businesses owned by persons of Asian ancestry, all of whom were singled out for disparate treatment and subjected to politically biased investigations, arrests, searches and seizures, all without probable cause, specifically because of race, national origin or political motivations. Despite having notice of these customs, policies and practices, Defendants and other high ranking

officials of Defendant LA County have failed to take any appropriate or remedial action to prevent the continuing misconduct by members of the LA County DA's Office.

200. During the relevant time period, the LA County DA's Office's employees, investigators and consultants were acting under the color of law.

201. The acts of the LA County DA's Office's employees, investigators and consultants deprived Plaintiffs of their rights to be free from unconstitutional searches, seizures and malicious prosecutions under the Fourth Amendment and the Fourteenth Amendment to the U.S. Constitution.

202. During the relevant time period, the LA County DA's Office's employees, investigators and consultants were acting pursuant to Defendant LA County's policy, practice or custom.

203. The conduct complained of herein was performed in Defendants' capacity as investigators performing investigative functions attempting to support a finding of probable cause, and further was performed in the complete absence of probable cause.

204. Defendants' conduct violated Plaintiffs' statutory and/or constitutional rights that were clearly established at the time of Defendants' conduct, and reasonably prudent persons would have understood that Defendants' conduct would violate Plaintiffs' statutory and/or constitutional rights.

205. As a direct and foreseeable result of Defendants' actions, Plaintiffs suffered economic and non-economic damages, including but not limited to lost profits, lost wages, lost business opportunities, mental anguish, emotional distress, humiliation and embarrassment.

## COUNT FIVE

### 42 U.S.C. § 1983 – *Monell* Liability: Ratification

### (Against Defendant LA County)

206. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 205, as if fully set forth herein.

207. After the unlawful arrest, search and seizure, all of which lacked probable cause, Defendant Gascón, the LA County DA, intentionally and/or recklessly ignored the unreliable, not

credible and untrustworthy source and patent inaccuracy of the information that prompted the frivolous and unjustified arrest, search and seizure in order to bring frivolous criminal charges against Mr. Yu—which effectively amounted to allegations of a breach of a contract to which Mr. Yu was not even a party—while publicly touting entirely different charges premised on the theft of U.S. Poll Worker Data.

208.    Defendant Gascón claimed that the charges were based on a supposed data breach that constituted "an ongoing threat to our digital way of life," even though the criminal complaint upon which the frivolous criminal charges were based was eventually shown to not even allege a data breach of any kind.

209.    Defendant Gascón further claimed that Plaintiffs failed to properly maintain LA County confidential data, including personal identifying information, with which they had been entrusted.

210.    Defendant Gascón further thanked the LA County DA's Office's employees, investigators and consultants who unlawfully conducted the arrest, search and seizure without probable cause "for their commitment to eliminating cyber intrusions against government entities and local businesses."

211.    Defendant Gascón was acting as an official spokesperson for Defendant LA County at the time he made these comments.

212.    Defendant Gascón had final policymaking authority from Defendant LA County concerning the investigation methods undertaken by LA County DA's Office employees, investigators and consultants and the proper motives for same.

213.    Defendant Gascón had final policymaking authority from Defendant LA County concerning the training and supervision of LA County DA's Office employees, investigators and consultants with regard to legal requirements for proper investigations, searches, seizures and criminal prosecutions.

214.    Defendant Gascón knew or should have known that LA County DA's Office employees, investigators and consultants routinely instigated unlawful searches, seizures and criminal prosecutions for transparently political, racist and/or xenophobic reasons.

-- 75 --

215.   Defendant Gascón consciously and affirmatively ratified and approved the actions conducted by the LA County DA's Office's employees, investigators and consultants in this regard.

216.   The conduct complained of herein was performed in Defendants' capacity as investigators performing investigative functions attempting to support a finding of probable cause, and further was performed in the complete absence of probable cause.

217.   Defendants' conduct violated Plaintiffs' statutory and/or constitutional rights that were clearly established at the time of Defendants' conduct, and reasonably prudent persons would have understood that Defendants' conduct would violate Plaintiffs' statutory and/or constitutional rights.

218.   As a direct and foreseeable result of Defendants' actions, Plaintiffs suffered economic and non-economic damages, including but not limited to lost wages, lost business opportunities, mental anguish, emotional distress, humiliation and embarrassment.

## COUNT SIX

### Conversion

### (Against Defendant LA County)

219.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 218, as if fully set forth herein.

220.   Defendant LA County currently possesses data and computer hardware owned by Plaintiffs, or to which Plaintiffs otherwise have an entitlement to possession. Defendant LA County willfully seized Plaintiffs' property—including, without limitation, computers, servers, phones and other equipment—as part of Defendant LA County's improper and unlawful search, seizure, arrest and criminal detention that lacked any probable cause whatsoever.

221.   On or about November 16, 2022, a Los Angeles County Superior Court Judge ordered Defendant LA County to return the seized property, yet, to date, Defendant LA County has continually refused to do so. While Defendant LA County purported to provide Plaintiffs with an electronic copy of the data that was contained on the seized computer equipment; that copy is encrypted and Plaintiffs were unable to access it without their original computer hardware which Defendants refuse to return to Plaintiffs. Moreover, Plaintiffs have no ability to access that data

1  without the computer equipment Defendant LA County unlawfully seized without probable cause

2  and that Defendant LA County continually refuses to return.

3    222.    Defendant LA County thus unlawfully and without probable cause assumed and

4  exercised dominion and control over the property to the exclusion of, or inconsistent with Plaintiffs'

5  rights as owners of the property, which removed the need for Plaintiffs to demand the return of the

6  property.  However, Plaintiffs have demanded the return of said property on multiple occasions and

7  Defendant LA County has continually refused to return said property.

8    223.    While Defendants purportedly acted pursuant to a warrant, on information and

9  belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to

10  any purported finding of probable cause, and further acted unreasonably under the circumstances.

11  Defendants had reason to doubt the truthfulness and reliability of this information, and knew or

12  should have known that the Election Deniers and the information they provided was unreliable, not

13  credible, untrustworthy and could not serve as a basis for a finding of probable cause.  Moreover,

14  on information and belief, the warrant was also obtained on the basis of materially false allegations

15  of crimes involving data breaches and theft of personal identifying information, only to see the

16  original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested,

17  to be replaced by a criminal complaint that alleged no such crimes.

18    224.    Defendants thus engaged in judicial deception by obtaining the warrant on the basis

19  of material misrepresentations and omissions that they knew or should have known were false, and

20  these misrepresentations and omissions were made intentionally for political, racist and xenophobic

21  reasons or, alternatively, with reckless disregard for the truth.  Based on the totality of the

22  circumstances, no reasonably prudent person could have concluded that probable cause existed

23  based on the information provided.  This is only further evidenced by the fact that, on information

24  and belief, Defendant Neff was subsequently placed on administrative leave and the criminal

25  charges were voluntarily dismissed as a result of potential bias in the presentation of evidence

26  during Defendants' investigation.

27    225.    Moreover, any warrant upon which the seizure was originally based is no longer

28  relevant in light of the existence of a court order compelling Defendant LA County to return

Plaintiffs' property, and Defendant LA County's continued refusal to comply with that order constitutes wrongful conversion.

226.   The manner in which Defendant LA County has continued to refuse to return Plaintiffs' property constitutes an operational decision that is incident to its normal functions and the ministerial implementation of basic policy.

227.   As remedies for Defendant LA County's conversion, Plaintiffs seeks compensatory and exemplary damages, a constructive trust over the converted materials, and an order requiring Defendant LA County to return the converted materials to Plaintiffs, including any materials currently in the possession of Cain & Associates and consultants Haury and Cain, without keeping copies of any privileged communications that Plaintiffs demanded be returned approximately 11 months prior to the date of this Complaint.

228.   Defendant LA County's conduct constitutes oppression, fraud or malice within the meaning of California Civil Code § 3294 and punitive and exemplary damages should be assessed against Defendant LA County.

## COUNT SEVEN

### Negligence

### (Against All Defendants)

229.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 228, as if fully set forth herein.

230.   Defendants Gascón, Stevens and Neff, as well as Cain & Associates and consultants Cain and Haury, while acting within the course and scope of their employment, consultancy or agency with Defendant LA County, owed Plaintiffs the duty to exercise reasonable care with regard to Plaintiffs' rights to be free from unlawful arrests, searches and seizures without any probable cause and to be free from the use of excessive force.

231.   Defendants Gascón, Stevens and Neff, as well as consultants Cain and Haury of Cain & Associates, by their conduct alleged herein, negligently, carelessly and wrongfully breached the duty to use reasonable care owed to Plaintiffs.

COMPLAINT

232.    Defendants LA County and Gascón knew or should have known that Defendants Stevens and Neff, as well as consultants Cain and Haury of Cain & Associates, were associates of the Election Deniers and had aligned themselves with the Election Deniers in their pursuit to destroy Plaintiffs' reputation and business.

233.    Defendants LA County and Gascón further knew or should have known that consultants Haury and Cain of Cain & Associates were unfit or incompetent to participate in an investigation, search and seizure of Plaintiffs' property, and thus should not have been hired or retained for same.  Defendants LA County and Gascón further knew or should have known that they should have required consultants Haury and Cain of Cain & Associates to execute confidentiality and non-disclosure agreements before retaining them to participate in a search and seizure of Plaintiffs' home, cars and offices.

234.    Defendants LA County and Gascón further knew or should have known that the hiring and retention of consultants Haury and Cain of Cain & Associates to investigate, search and seize Plaintiffs' property created a particular risk of harm to Plaintiffs, particularly given consultants Haury's and Cain's association with the Election Deniers and their racist and xenophobic views of Chinese Americans, and thus should not have hired or retained consultants Haury and Cain of Cain & Associates for that purpose.

235.    Defendants LA County and Gascón further failed to maintain adequate and proper training and supervision of Defendant Neff, Defendant Stevens and consultants Haury and Cain of Cain & Associates as to the constitutional rights of Defendant LA County's citizens, and failed to require Cain & Associates, Haury and Cain to execute confidentiality and non-disclosure agreements prior to participating in the search and seizure of Plaintiffs' home, cars and offices.

236.    Defendants LA County and Gascón knew or should have known, based on investigation documents, arrest reports, departmental reports, claims for damages and lawsuits, that the inadequate training and supervision was likely to result in a deprivation of the right of citizens to be free from unreasonable searches and seizures and the use of excessive force.

237.    Defendant Stevens knew or should have known that he is ethically bound, as a member of the LA County DA's Office, not to, among other things, (a) permit personal feelings,

prejudices, political beliefs, aspirations, animosities or friendships to influence his decisions; (b) use the wrongful or unlawful exercise of authority for a malicious purpose, personal gain, willful deceit or any other improper purpose; (c) discriminate against, oppress or provide favoritism to any person because of race or national origin; and (d) fail to disclose or misrepresent material facts, or make false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

238. Defendants Neff and Stevens, as well as consultants Cain and Haury of Cain & Associates, in their capacity as LA County DA's Office employees, investigators and consultants, negligently violated Plaintiffs' right to be free from unreasonable searches and seizures and the use of excessive force.

239. Defendants LA County and Gascón were deliberately indifferent to the widespread misconduct on the part of LA County DA's Office employees, investigators and consultants in engaging in unlawful searches, seizures for transparently political, racist and/or xenophobic reasons as well as the unnecessary use of excessive force.

240. Defendants LA County's and Gascón's failures to provide adequate training and supervision was the direct and foreseeable cause of the deprivation of Plaintiffs' rights to be free from unreasonable searches and seizures and the use of excessive force.

241. While Defendants purportedly acted pursuant to a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, and further acted unreasonably under the circumstances. Defendants had reason to doubt the truthfulness and reliability of this information, and knew or should have known that the Election Deniers and the information they provided were unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause. Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

242.     Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth.   Based on the totality of the circumstances, no reasonably prudent person could have concluded that probable cause existed based on the information provided.   This is only further evidenced by the fact that, on information and belief, Defendant Neff was subsequently placed on administrative leave and the criminal charges against Mr. Yu were voluntarily dismissed as a result of potential bias in the presentation of evidence during Defendants' investigation.

243.     Defendants' conduct complained of herein constitutes operational decisions that are incident to Defendants' normal functions and the ministerial implementation of basic policy.

244.     Defendant LA County is liable through respondeat superior pursuant to common law and California Government Code § 815.2 and/or is vicariously liable for the negligence of its employees, investigators, consultants and agents within the course and scope of their employment, consultancy or agency as alleged herein.   At all times material to this cause of action, Defendants Gascón, Neff and Stevens, as well as Cain & Associates and consultants Cain and Haury, and any investigators were acting in the course and scope of their employment, consultancy or agency with Defendant LA County.

245.     As a direct and proximate cause of Defendants' negligence, Plaintiffs have suffered damages and injuries as alleged herein.

## COUNT EIGHT

### Intentional Infliction of Emotional Distress

### (Against All Defendants)

246.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 245, as if fully set forth herein.

247.     Defendants' conduct, as alleged herein, was extreme and outrageous and beyond the scope of conduct that should be tolerated by citizens in a democratic and civilized society. Defendants, acting individually, jointly and/or in conspiracy with others, committed extreme and

outrageous acts with the intent to inflict severe and extreme mental anguish and emotional distress upon Plaintiffs, including:

- Subjecting Plaintiffs to an improper and unlawful arrest, search and seizure and detention based on unsubstantiated and baseless conspiracy theories concocted by the Election Deniers with full knowledge of the falsity of those conspiracy theories and the Election Deniers' well-known history of making thoroughly debunked claims about election malfeasance or, alternatively, with reckless disregard for the truth of said conspiracy theories;

- Raiding Mr. Yu's home without probable cause and with excessive force, with weapons drawn, using a battering ram to force their way into Mr. Yu's home despite having Mr. Yu in custody, keys to Mr. Yu's home and his complete lack of any criminal history and the non-violent nature of the frivolous criminal charges ultimately asserted against Mr. Yu, which effectively amounted to nothing more than an alleged breach of contract (something that is not, in fact, a criminal offense);

- Retaining consultants Cain and Haury of Cain & Associates and having them participate in the raids on Mr. Yu's home and Konnech's business offices even though Cain and Haury are known to be close associates of the Election Deniers, with Haury appearing on stage as a speaker at The Pit event (which was attended by Defendant Stevens) during which he demonstrated racism and xenophobia by saying that "*any* Chinese nationalized citizen is a risk," even though Haury previously testified as a fact witness before the grand jury, and both Haury and Cain have previously and publicly solicited donations for Election Deniers as part of supposed political "fundraising" efforts that were instead diverted by the Election Deniers for their own financial benefit;

- Confiscating phones during their illegal search and seizure to prevent Mr. Yu's wife from reaching out to an attorney;

- Refusing to tell Mr. Yu's wife where Mr. Yu would be detained and refusing to permit Mr. Yu to make a phone call to reach his attorney, which served to prevent Mr. Yu's wife and attorney from locating Mr. Yu until the middle of the night, more than 15 hours after his unlawful arrest;

- Intimidating Konnech's employees during the unlawful search and seizure at Konnech's business office and subjecting them to interrogation without counsel present, confiscating all of Plaintiffs' computer equipment, hard drives and servers—which included privileged email communications between Plaintiffs and their legal counsel that to this date have yet to be returned—which interfered with Plaintiff's performance under contracts with various governmental entities in the 2022 Midterm Election that was then mere weeks away;

COMPLAINT

- Requiring Mr. Yu to undergo unnecessary and costly bail hearings in both Michigan and California, an unnecessary and costly extradition proceedings in Michigan, and unreasonably rejecting Mr. Yu's offer to voluntarily travel to Los Angeles for his arraignment;

- Attempting to shackle and "perp-walk" Mr. Yu through the courtroom even though Mr. Yu had, by that time, been voluntarily sitting in the LA County courtroom for two days awaiting his arraignment;

- Unlawfully detaining Mr. Yu in California for a period of approximately 37 days while Defendants unsuccessfully sought to deny him bail; and

- Seeking unjustifiable bail restrictions in yet another bail hearing in LA County after Mr. Yu prevailed in Michigan and voluntarily traveled to Los Angeles for his arraignment, all despite Mr. Yu's lack of any criminal history and the fact that he had already surrendered his passport which ultimately resulted in Mr. Yu being held in Los Angeles under house arrest at a Los Angeles hotel—more than 2,200 miles from his home and Konnech's office in Michigan—while wearing two different ankle monitors (one for Michigan and one for California), and also prohibited Mr. Yu from communicating with any Konnech employees during the weeks leading up to the 2022 Midterm Election leading to a failure to fulfill election-related contracts and a resulting crippling loss of revenue.

248. While Defendants purportedly acted pursuant to a warrant, on information and belief, Defendants obtained that warrant based on misrepresentations and/or omissions material to any purported finding of probable cause, and further acted unreasonably under the circumstances. Defendants had reason to doubt the truthfulness and reliability of this information, and knew or should have known that the Election Deniers and the information they provided were unreliable, not credible, untrustworthy and could not serve as a basis for a finding of probable cause. Moreover, on information and belief, the warrant was also obtained on the basis of materially false allegations of crimes involving data breaches and theft of personal identifying information, only to see the original sealed indictment abandoned after the warrant was executed and after Mr. Yu was arrested, to be replaced by a criminal complaint that alleged no such crimes.

249. Defendants thus engaged in judicial deception by obtaining the warrant on the basis of material misrepresentations and omissions that they knew or should have known were false, and these misrepresentations and omissions were made intentionally for political, racist and xenophobic reasons or, alternatively, with reckless disregard for the truth. Based on the totality of the

1    circumstances, no reasonably prudent person could have concluded that probable cause existed

2    based on the information provided.  This is only further evidenced by the fact that, on information

3    and belief, Defendant Neff was subsequently placed on administrative leave and the criminal

4    charges were voluntarily dismissed as a result of potential bias in the presentation of evidence

5    during Defendants' investigation.

6        250.    Defendants' conduct complained of herein constitutes operational decisions that are

7    incident to Defendants' normal functions and the ministerial implementation of basic policy.

8        251.    Defendants Gascon's, Neff's, and Stevens', and Cain & Associates' and consultants

9    Cain's and Haury's, acts or omissions as alleged herein were performed within the course and scope

10   of their employment, consultancy or agency with Defendant LA County.  Defendant LA County is

11   thus liable through respondeat superior pursuant to common law and CAL. GOV. CODE § 815.2

12   and/or is vicariously liable for the acts of its employees, investigators, consultants and agents within

13   the course and scope of their employment, consultancy or agency as alleged herein.  At all times

14   material to this cause of action, Defendants Gascón, Neff and Stevens, and Cain & Associates and

15   consultants Cain and Haury, and any investigators were acting in the course and scope of their

16   employment, consultancy or agency with Defendant LA County.

17       252.    Defendants, acting in concert with one another and with other known and unknown

18   co-conspirators including, without limitation, the Election Deniers, Cain & Associates, Cain, Haury

19   and law enforcement personnel in Michigan, reached an agreement amongst themselves to violate

20   Plaintiffs' state law rights in connection with Count Eight and conspired by concerted action to

21   accomplish an unlawful purpose by unlawful means.  In addition, these co-conspirators agreed

22   amongst themselves to protect one another from liability for these violations of Plaintiffs' rights.

23   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was

24   otherwise a willful participant in joint activity, and each co-conspirator was acting as individuals

25   for their individual advantage in furtherance of political, racial and xenophobic beliefs.  The

26   violations of law described herein were accomplished by Defendants' conspiracy.  The misconduct

27   described herein was objectively unreasonable, was undertaken intentionally, in total disregard of

28   the truth regarding the baseless conspiracy theories that served as the foundation of Defendants'

1   investigation of Plaintiffs and all subsequent acts, and with willful indifference to Plaintiffs' state

2   law rights in connection with Count Eight.

3        253.    As a proximate result of Defendants' willful, intentional and malicious conduct,

4   Plaintiffs suffered severe and extreme mental anguish, emotional distress, humiliation, degradation,

5   physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

6        254.    Defendants' conduct constitutes oppression, fraud or malice within the meaning of

7   California Civil Code § 3294 and punitive and exemplary damages should be assessed against

8   Defendants.

9                                    **PRAYER FOR RELIEF**

10       WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

11       a.    Compensatory, punitive and exemplary damages in an amount to be determined at

12             trial, constituting its losses foreseeably resulting from Defendants' misconduct;

13       b.    A constructive trust for the return of Plaintiffs' stolen and converted property,

14             including any property currently in the possession of Cain & Associates and

15             consultants Haury and Cain, without keeping copies of any privileged

16             communications;

17       c.    Reasonable and necessary attorneys' fees pursuant to statute;

18       d.    Pre- and post-judgment interest at the maximum rate allowed by law;

19       e.    All costs of suit; and

20       f.    All such other and further relief, both general and special, at law or in equity, to

21             which Plaintiffs may show themselves to be justly entitled or as this Court may deem

22             appropriate.

23                                       **JURY DEMAND**

24       Plaintiffs demand a jury trial on all issues triable by jury.

25   Dated: September 12, 2023

26                                    KASOWITZ BENSON TORRES LLP

27

28                                    By:    */s/ Constantine Z. Pamphilis*

                                         -- 85 --

Constantine Z. Pamphilis
*Pro Hac Vice* to be submitted
Texas State Bar No. 00794419
DPamphilis@kasowitz.com
J. Michael Wilson
*Pro Hac Vice* to be submitted
Texas State Bar No. 24047125
MWilson@kasowitz.com
Nathan W. Richardson
*Pro Hac Vice* to be submitted
Texas State Bar No. 24094914
NRichardson@kasowitz.com
1415 Louisiana Street, Suite 2100
Houston, Texas 77002
(713) 220-8800
(713) 222-0843 (fax)

Daniel A. Saunders
California Bar No. 161051
DSaunders@kasowitz.com
2029 Century Park East, Suite 200
Los Angeles, California 90067
(424) 288-7900
(424) 288-7901 (fax)

*Attorneys for Plaintiffs Konnech, Inc. and Eugene Yu*

COMPLAINT